REYNOLDS *v.* McNEILL.

4-9348                                                          236 S. W. 2d 723

Opinion delivered February 26, 1951.

*Homer T. Rogers* and *Gaughan, McClellan & Gaughan,* for appellant.

*Keith & Clegg,* for appellee.

GEORGE ROSE SMITH, J. This is an action by the appellants to cancel an oil and gas lease which they executed to appellee McNeill on April 7, 1949. The lease was for a term of six months and as long thereafter as oil or gas was produced in paying quantities. The lessee paid nothing for the lease, the instrument containing this provision: ''The consideration for the execution of this lease is: Lessee agrees to begin the drilling of a well . . . before the 15th of May, 1949, and to continue . . . with due diligence . . . to a depth of 5,000 feet unless oil or gas in paying quantities is found at a lesser depth. It is agreed that if said well is not commenced and drilled, as herein provided, this lease shall terminate as to both parties without further release or assignment.''

The appellants filed this suit on February 16, 1950, alleging that the lessee had failed to drill to 5,000 feet, had failed to produce oil or gas in paying quantities, and had abandoned the well that had been completed. The chancellor, refusing to declare an immediate forfeiture, entered a decree allowing the appellees sixty days in which to produce oil or gas in paying quantities.

When the lease was executed the lessors knew that McNeill could not finance the well and would have to obtain outside aid. The Petersen Drilling Company agreed to drill the well and did drill it to a depth of 3,870 feet, at a cost of about $40,000. On May 31 a successful attempt was made to obtain production at about 2,800 feet. Whether this initial production was ''in paying quantities'' is a disputed issue.

There is really very little testimony as to production in the early days of the well, as neither member of the Petersen partnership testified at the trial. McNeill testified without objection that M. Q. Petersen had told him that the well was making twenty-five barrels of oil a day. Bill Griffin was employed to pump the well from July 7 until pumping was discontinued late in November, and he testified that during this period the well produced about two barrels a day. Appellant Dan Reynolds said that all the well ever pumped was about two and

a half barrels a day, but there is little in his testimony to indicate that he had extensive first-hand knowledge of the well during the period immediately after it was completed.

On this point the most convincing evidence is a report made by Petersen to the Oil and Gas Commission, in which it was stated that the well at first produced twenty-five barrels (apparently daily). This report was not objected to, and in any event we think it was admissible as a memorandum of a fact made in the regular course of business. Ark. Stats., 1947, § 28-928. Petersen had drilled the well, and his statement as to its initial production is entitled to much more weight than that of other witnesses who had little or no personal knowledge of the facts. We conclude that the well at first produced twenty-five barrels a day, and practically all the testimony indicates that such production must be considered to be "in paying quantities" as that phrase is used here. See Summers, Oil and Gas, § 306.

A pump was installed not later than July 7, and thereafter the well produced about two or three barrels of oil a day, and a far greater quantity of salt water, until pumping was discontinued in the latter part of November. Petersen then notified the Oil and Gas Commission that he considered the well to be dry and intended to plug it on December 7.

McNeill, however, believed that the well could be reworked and made to produce commercially. It was his theory, shared by Dan Reynolds and others, that fine sand had filtered into the bottom of the drill casing and had obstructed the flow of oil. If this sand could be cleaned out the well might again produce at its original depth or at some higher point. Upon this theory McNeill obtained Petersen's permission to use the equipment that was still at the well. Petersen then notified the Commission that the well had been turned over to McNeill for further testing.

In December A. H. Pesnell agreed to rework the well for McNeill, but due to a misunderstanding with

Petersen that agreement was not carried out. McNeill then made a similar contract with appellee, Watts, a drilling contractor. At least as late as January appellants, Dan and James Reynolds, knew of McNeill's efforts and made no contention that the lease had forfeited; in fact, they were then endeavoring to obtain an assignment of the lease to themselves. But when Watts attempted to enter the land with his equipment on February 13 he was told by the Reynolds brothers that they considered the lease no longer valid. This suit was filed three days later.

The chancellor was right in refusing to declare a forfeiture. The lessee and his assignees had spent large sums in successfully attaining production within the primary term of six months. When that event occurred a valuable estate vested in the lessee, to continue as long as oil or gas was produced in paying quantities.

The appellants contend, however, that the estate terminated at the end of the primary term because oil was no longer being produced in commercial amounts. According to the weight of authority, and we think the better view, when the lessee's estate has vested it does not automatically terminate upon a temporary cessation of production. In ventures of this kind the lessee makes a very substantial investment and bears the entire loss if the well is unproductive. It would be harsh and inequitable to say that upon a temporary stoppage of production the lessor can declare a forfeiture and take over the property himself. Hence most authorities allow the lessee a reasonable time within which to reinstate paying production. For instance, in a case where the derricks blew down in a heavy storm, and later burned, the lessor was not permitted to declare the lease at an end because his royalties had ceased for the time being. *Zeller* v. *Book*, 28 Ohio C. C. 119. Similarly, in *Blair* v. *Ohio Nat. Gas Co.*, 12 Ohio C. C. 78, 5 Ohio C. D. 619, a gas well went dry after flowing for about seven years. The lessee first tried to remove the pipe and clean the well, but that attempt failed. He then staked out a new location for the drilling of an oil well. The court refused to

allow a forfeiture. Other cases include *Wilson* v. *Holm,* 164 Kan. 229, 188 P. 2d 899, and *Watson* v. *Rochmill,* 137 Tex. 565, 155 S. W. 2d 783.

We are not willing to 'say that the chancellor was wrong in giving the appellees sixty days of grace in which to resume paying production. The lessee has never relaxed his efforts to make this well profitable to the lessors. When the output of salt water became too great for the pump Petersen removed the pipe and installed a larger one in the hope of increasing the withdrawal of oil. After Petersen gave up the well McNeill took it over and was about to begin cleaning out the sand when the lessors abruptly decided that a forfeiture had occurred months before. Dan Reynolds testified with commendable candor that he thought the well had possibilities and that if the lease should be canceled he intended to try to rework the well by removing the sand in the.casing. McNeill and those working with him have expended over $40,000 in attaining production and in attempting to continue that production. They have not abandoned their efforts for any appreciable time. The appellants did not make their dissatisfaction known until three days before suit was filed. They are not in a position to complain of the chancellor's ruling.

Affirmed.