WOODSON OIL COMPANY et al.,
Appellants,

v.

J. P. PRUETT et al., Appellees.

No. 12843.

Court of Civil Appeals of Texas.

San Antonio.

June 1, 1955.

Rehearing Denied July 13, 1955.

Keys, Russell, Keys & Watson, Corpus Christi, William E. Nicholas, Sinton, for appellants.

W. B. Moss, Sinton, Reese Wade, Beeville, for appellees.

W. O. MURRAY, Chief Justice.

This suit was instituted by J. P. Pruett and wife Nellie Pruett, J. W. Crouch and wife, Mary Crouch, Crouch Dairies, Inc.; and Weldon Winsauer, against Woodson Oil Company, a corporation, Fred M. Manning, and some eleven other defendants, seeking, in the first count of their petition, to recover the title and possession of 575.86 acres of land lying and being situated in San Patricio County, Texas, and, in the second count, cancellation of an oil and gas lease upon the same 575.86 acres. The cause was submitted to a jury and judgment rendered in keeping with the findings of the jury, in effect, cancelling the oil and gas lease and awarding the title and possession of the land to plaintiffs, from which judgment Woodson Oil Company, Fred M. Manning, Martin Wunderlich, William G. Pollard and Point Corporation have prosecuted this appeal.

■ Appellants' first contention is that the court erred in overruling their plea in abatement based upon a misjoinder of parties plaintiff. We overrule this contention. It is true that the 575.86 acres were alleged to have been owned severally and not jointly by the appellees, but Rule 40(a), T.R.C.P., permits just such a joinder of parties plaintiff. There was an oil and gas lease covering the several tracts composing the 575.86 acres of land, and the several owners of these tracts were jointly seeking to cancel this oil and gas lease. Barbee v. Buckner, Tex.Civ.App., 265 S. W.2d 869, ref. n. r. e.; Doyle v. Stanolind Oil & Gas Co., 5 Cir., 123 F.2d 900.

■ Appellants next contend that the trial court erred in overruling their motion for judgment non obstante veredicto because appellees failed to prove the location of the land upon the ground, or that it was located in San Patricio County, Texas. We are well aware of the rule that in a trespass to try title suit, where the location of the land on the ground is an issue and not admitted, it must be established by evidence by the plaintiff. 41–A Tex.Jur. 6529, Trespass to Try Title, § 132; Withers v. Republic Nat. Bank of Dallas, Tex. Civ.App., 248 S.W.2d 271; Tasher v. Foster Lumber Co., Tex.Civ.App., 205 S.W.2d 665. However, there seemed to be no issues here as to the location of the land. Appellees were claiming the right to the title and possession of the land, free from the oil and gas lease, while appellants were

claiming a valid oil and gas lease on the land. The real controversy was whether appellees were entitled to have the lease cancelled. Various instruments were introduced in evidence by both appellees and appellants describing the land by metes and bounds, which could be located on the ground. Neither side indicated there was anything wrong with this description. Appellants had drilled two wells upon the land, and the location of one of the wells was shown upon Plaintiffs' Exhibit No. 9. This exhibit also shows a plat of the land, including an adjoining tract, and certain county roads. Appellants seem to contend that this exhibit was admitted only for limited purposes, but the record does not so show. Defendants' Exhibit No. 14 is a copy of the oil and gas lease introduced in evidence by appellants. It sets out a full and complete description of the 575.86 acres of land here involved. In some of the instruments the land is described as being about three miles north of the town of Mathis in San Patricio County, Texas; survey numbers and land script numbers are given. The witness Sao Villarreal, who re-worked one of the wells on the land for appellants, testified that the well was located on the J. P. Pruett land north of Mathis. This well was known as the Ross-Singleton No. 1. The evidence is sufficient to locate the land on the ground and as being in San Patricio County. The entire record shows that there was no issue between the parties as to the location of the land, and that its location was seemingly well known to all parties.

Appellants next contend that the trial court erred in permitting appellees to read in evidence their "Exhibit 2." This exhibit was a warranty deed from James H. Ross and wife, Anna B. Ross, and Wiley W. Singleton and wife, Lenora E. Singleton, to J. W. Crouch and wife, Mary E. Crouch, of a part of the land here involved, dated November 10, 1948, and recorded in Vol. 147, pp. 410, Deed Records of San Patricio County, Texas.

Appellees gave due notice of their intention, under the provisions of Art. 3726, Vernon's Ann.Civ.Stats., of introducing this instrument in evidence by reading it from the record. This notice gave the nature of the instrument, the names of the parties, its date, the volume in which it was recorded, but got the digits transposed in giving the page. The notice stated, page 140, while the correct number of the page was 410. In view of the fact that one of the purposes of Art. 3726, supra, is to give the opposing party notice of the instrument to be offered in evidence, so as to enable such opposing party to file affidavits of forgery, if he sees fit to do so, we are of the opinion that the notice given was sufficient to comply with the intention and purpose of Art. 3726, supra. In any event, no objection was offered to the instrument when it was read in evidence. Appellants offered an explanation of their failure to object at the proper time. The trial judge heard this explanation and refused to strike the instrument. This was a matter addressed to the trial court's discretion. Newberry v. Campbell, Tex.Civ. App., 142 S.W.2d 318.

Appellants further contend that before an instrument can be read in evidence from the County Clerk's records, it must be shown that the land lies in the county where the trial is taking place and in the same county where the instrument offered is recorded. This is undoubtedly true, but, as above stated, the evidence is sufficient to show that the land here involved was located in San Patricio County.

With reference to appellees' second count in their petition the jury found, in effect, that the Ross-Singleton well ceased to produce gas in any quantity on December 14, 1952, and that such cessation of production continued for sixty consecutive days from November 20, 1952. Appellants contend that there is no evidence, or the evidence is insufficient, to support these findings.

The oil and gas lease here involved was executed on November 14, 1947, and provided for a primary term of five years. It covered the four tracts described in appellees' petition. The lease was executed by J. H. Ross and wife, and W. W. Singleton and wife, when they owned the land.

Two wells had been drilled upon the land, one, which was never completed as a producing well, was located upon that part of the land which now belongs to Weldon Winsauer, and the other, known as the Ross-Singleton No. 1, was located upon that part of the land which now belongs to J. P. Pruett and wife. This well was completed as a gas well and was in production for a time. When this suit was filed the primary term had expired and the continuance of the lease depended upon production from this well, as there were no other producing wells on the lease. In this connection, the lease contained the following provisions:

"Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder, or drilling or re-working operations are conducted thereon."

"If at the expiration of the primary term, Lessee is conducting operations for drilling a new well or re-working an old well, or if after the expiration of the primary term, production on this lease shall cease, this lease nevertheless shall continue as long as said operations continue or additional operations are had, which additional operations shall be deemed to be had where not more than Sixty (60) days elapse between abandonment of operations on one well and commencement of operations on another well, and if production is discovered this lease shall continue as long as additional operations are had."

It is undisputed that there were no reworking operations, or additional drilling operations, had on the lease between November 20, 1952, and May 1, 1953. The jury found that production from the Ross-Singleton Well ceased on December 14, 1952, and that such cessation of production continued for sixty consecutive days thereafter. Based upon these findings the trial court rendered judgment in effect cancel-ling the lease, and if these findings of the jury are supported by sufficient evidence the judgment should be affirmed.

In attempting to prove that production had ceased for more than sixty days from Ross-Singleton Well No. 1, appellees put on a number of lay witnesses who testified that prior to November 21, 1952, they had viewed the well and determined that it was producing gas by finding water in the slush pit, sweat on the pipe leading from the well, a roaring sound in the pipe and the gauge showing pressure. After November 21, 1952, they had watched the well closely and found that the water in the slush pit had dried up, there was no sweat on the pipe leading from the well, there was no roaring sound in the pipe, and the guage showed no pressure.

Typical of these witnesses was J. V. Nelson, who owned land adjoining the Pruett tract. He testified that he went by and looked at the Ross-Singleton No. 1 Well nearly every day during November, December and January; he noticed each time the gauges were on zero and the needle on the meter chart was on zero; that there was no sweating on the pipe; that there was no noise from the flow of gas; that the water quit flowing from the well and the slush pit dried up; that from May, 1952, until November, 1952, the needle on the chart showed it was making gas, there was noise from the flow of gas, the gauge showed a pressure of about 1500 pounds. On cross-examination by appellants, he testified that if the needle on the meter chart was on zero it was not producing gas, and that this condition on the Ross-Singleton Well continued from "along in November until the last of February or first of March, 1953"; that if the indicator is on zero, it means the well is not capable of producing gas if the valves are open.

Appellee Weldon Winsauer, who qualified as an expert, testified that he observed the Ross-Singleton Well during December, 1952, January and February, 1953, and "the well was dead" and unable to produce gas into the pipe line; that the well "was completely dead" in February, 1953, when the workover crew was there, that the fact that there

was a small amount of gas from the well after the swabbing on November 20, 1952, would indicate the gas came out of the water in the well and not from the sand, and this would indicate that the well was completely dead; that if there was an incorrect meter calibration on the meter on this well, it would show production on the chart when in fact there was no production; that the condition of the pressure on the well making the needle on the chart stand a little away from zero would not be enough to let the well produce into the pipe line which had a pressure of from 350 to 400 pounds.

The witness Weldon Winsauer qualified as an expert in the following manner: He obtained a Bachelor of Science Degree and a Master's Degree from the University of Texas in Chemical Engineering. He qualified as a geologist with regard to the nature of oil and gas sands. He worked for Phillips Petroleum Company, operating a mud logging truck, analyzing mud and cuttings made in drilling wells; he interprets drilling logs for wells; he interprets electric well logs. He studied gas wells, testing them, the valves, and apparatus on them. He qualified as an expert to estimate the consumption of gas. He qualified as an expert on the rate of flow of gas, and as an expert on electric measuring devices to measure gas by use of a meter and chart. He spends one-half of his time in the geological department of Humble Oil & Refining Company, and has been in the production department of that company for six years. He qualified on valves on gas wells and was familiar with making back pressure tests on gas wells. He is an expert on gas sand permeability. He has had experience, both as a geologist and a a petroleum engineer, and qualified as an expert in estimating oil and gas reservoirs underground.

■ Appellants contend that Weldon Winsauer should not have been permitted to testify as an expert because it was not shown that he had worked in the field. Whether he should have been permitted to testify as an expert, under the testimony introduced, was a matter addressed to the sound discretion of the trial court, and under the proof, the trial court did not abuse his discretion in permitting Weldon Winsauer to testify as an expert.

Appellants put on much testimony by expert witnesses tending to refute or explain away the testimony offered by appellees. There was evidence to the effect that the slush-pit's being dry did not mean that the well was not producing gas, and the fact that the gauge did not show pressure did not indicate lack of production. The fact that the witnesses did not hear any roaring sound or see any sweat on the pipe leading from the well was explained by the fact that the well had greatly reduced in production, causing the opening of the choke of the well, and with this choke open there would not be a sound in the pipe or sweat on it.

Appellants offered evidence that the charts on the well showed production in January, and thus refuted the idea that there was a cessation of production for a period of sixty days. Mr. Gerhardt had filed a report with the Railroad Commission showing no production in January, but, after being informed that appellees were declaring the lease forfeited for failure of production, filed an amended report showing some production in January. Appellants contend that the production charts offered in evidence could not be wrong and must be accepted as conclusive of the fact that there was some production. However, a chart for the Ross-Singleton Well was found on the Nelson Well. The witness Londrith, who handled the gauge charts, admitted this fact and said that he discovered it but did not make the change because it was muddy at the time. Appellees offered evidence that there was no mud at that time.

The witness Sao Villarreal, who was in charge of re-working the Ross-Singleton Well on November 20, 1952, testified, "As far as I could tell, I believe it was dead. It was when I left there."

■ The evidence though contradicted was sufficient to support the jury's finding that the well ceased production on December 14, 1952, and that such cessation continued for a period of sixty days.

164

■ Appellants next contend that the lease did not terminate on February 13, 1953, because Pruett ratified the lease by executing a division order on January 15, 1953. We overrule this contention. At the time Pruett executed this division order the lease was in full force and effect and needed no ratification.

■ Appellants further contend that Pruett ratified the lease by accepting royalty payments under the lease. The record shows that Pruett received a check from Woodson Oil Co., which included $4.62 royalty on the Ross-Singleton Well for the month of January, 1953, and $29.19 compensation royalty on the Nelson Well, the check being for the sum of $33.81. He got another check for $198.85, for royalty from Ross-Singleton Well, for the months of May, 1952, to December, 1952. He took these checks to his lawyer and he advised Pruett to cash the checks and return the royalty on Ross-Singleton Well for the months of December, 1952, and January, 1953. This he did. The record does not show when these checks were cashed. If they were cashed after the lease had terminated, this could not bring life back into a lease which had terminated by its own terms. Guerra v. Chancellor, Tex.Civ.App., 103 S.W.2d 775.

Appellants have cited Texas & Pacific Coal & Oil Co. v. Kirtley, Tex.Civ.App., 288 S.W. 619; Mooers v. Richardson Petroleum Co., 146 Tex. 174, 204 S.W.2d 606; Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908, and Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S.W.2d 395, as authority for the proposition that acceptance by a lessor of a royalty payment after a lease has terminated by its own provision for cessation of production constitutes a ratification of the lease and prevents the lessor from thereafter asserting that the lease has terminated, and that this is true without the necessity of invoking the principle of estoppel. We have examined these authorities and do not find that they support appellants' contention.

[11] There is no principle of forfeiture involved when a lease is terminated by its own provisions for cessation of production. 7 Tex.Law Rev. 8, also page 530; Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Flato v. Weil, Tex.Civ.App., 4 S.W.2d 992; Heard v. Nichols, Tex.Com.App., 293 S.W. 805; Stephenson v. Calliham, Tex.Civ.App., 289 S.W. 158.

In Gas Ridge v. Suburban Agr. Properties, 5 Cir., 150 F.2d 363, at page 365, the Court said:

"As to waiver and estoppel, plaintiff did nothing in any way to mislead defendant or even to induce it to develop the property. It only took the meager pittance defendant from time to time sent it, and it seems to be well settled in the law that the mere receipt of payments on account of minerals taken from one's own property does not operate as a waiver of, or an estoppel to assert, the claim that the rights of the taker as lessee have terminated."

We find it unnecessary to decide whether the lease terminated as to J. W. Crouch and wife on November 14, 1950, because of appellants' failure to timely pay shut-in gas royalty. We have definitely decided that the lease terminated as to all parties on February 13, 1953, and this disposes of the controversy.

■ Appellants next contend that the cessation of production on the lease was sudden and only temporary, and that under such circumstances they were entitled to a reasonable time in which to remedy the defect and resume production. This might be true under the terms of some leases, but under the lease here the parties agreed and stipulated what would constitute temporary cessation. The lease provides, in effect, that if production should cease the lessee must commence re-working or additional operations within sixty days or the lease would terminate. If the cessation of production is for more than sixty consecutive days it is not to be regarded as temporary under the terms of this lease. If re-working or additional operations are not begun

within the sixty-day period the lease terminates by its own provisions. Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311; St. Louis Royalty Co. v. Continental Oil Co., 5 Cir., 193 F.2d 778; 28 Tex.Law Rev. 895; McQueen v. Sun Oil Co., 6 Cir., 213 F.2d 889.

The judgment is affirmed.