Minnie E. **HABY**, Joined pro forma by her husband, Homer H. Haby, Appellants,

v.

**STANOLIND OIL AND GAS COMPANY**, Appellee.

No. 15197.

United States Court of Appeals Fifth Circuit.

Dec. 30, 1955.

Rehearing Denied March 20, 1956.

W. Truett Smith, Scott Snodgrass, Snodgrass & Smith, San Angelo, Tex., for appellants.

Lon Sailers, Dallas, Tex., Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Tex., L. A. Thompson, Tulsa, Okl., of counsel, for appellee.

Before HOLMES and RIVES, Circuit Judges, and THOMAS, District Judge.

RIVES, Circuit Judge.

Haby, wife and husband, sued Stanolind in a Texas state court seeking to have the court declare an oil and gas lease terminated in so far as it covered Haby's land. Stanolind removed the case to the federal court on the ground of diversity of citizenship, and there defended and asked the court to declare the lease in full force and effect as to Haby's land. The requisite diversity of citizenship and jurisdictional amount affirmatively appear.

The mineral lease covered lands in three sections, numbered 4, 5 and 7, located in Reagan County, Texas. Haby was the lessor as to the lands in Sections 5 and 7, and the lands in Section 4

were separately owned. This Court had some misgiving as to whether the lessor of the lands in Section 4 was or was not an indispensable party, and called for briefs. Haby v. Stanolind Oil & Gas Co., 5 Cir., 225 F.2d 723. Both Haby and Stanolind now urge that all persons whose interests will be affected by a decision in this cause are before the Court, and pray the Court to retain jurisdiction and render a final decision upon the merits. We agree.

The original lessor was Sadie J. Weddell, a widow, the common source of title of all parties to this lawsuit. Other than certain nonparticipating royalty interests,[1] Mrs. Haby succeeded to the full title to Sections 5 and 7 subject to the lease and Mrs. Weddell remained the fee owner of Section 4.[2] The pleadings do not attack the validity of the lease nor seek its cancellation, nor a declaration of its termination as to Section 4; they require only a determination of the legal effect upon the title to Sections 5 and 7 of (1) a cessation of production under the lease, and (2) certain transactions between Haby and Stanolind claimed by Stanolind to constitute a waiver of such cessation of production. Whether the owner of Section 4 made such a waiver or some other arrangement with Stanolind does not appear. Mr. Haby testified at the trial:

"Q. And in this suit you are not seeking to recover Section 4, or have declared terminated the lease on Section 4? A. No, sir, I am not attacking that at all."

\* \* \* \* \*

"Q. You are not attacking the title of Stanolind Oil & Gas Company's lease as to Section 4? A. That is correct.

"Q. You here admit that Stanolind has a good title to Section 4? A. That is not to my knowledge or concern.

"Q. So far as your wife's interest is concerned, you are not questioning Stanolind's title to Section 4? A. We are not questioning anything about Section 4, it is not in issue."

In its supplemental brief, Stanolind expressly "stipulates and agrees that in any suit brought by the participating royalty owner of Section 4 it will not urge this case as res judicata of the question involved, but rather hereby agrees to defend such suit as a separate and independent cause of action, which it will be." Indeed, any judgment rendered in this case cannot be res judicata as to the lessor of the lands in Section 4, who is not before the Court. True, this Court has said in Keegan v. Humble Oil Refining Co., 5 Cir., 155 F.2d 971, 973: "The fact that the decree would not be technically binding on the absent parties is not the controlling factor." However, as to absent parties, whose property interests are not bound by the decree, we agree with what has been so

1. The owners of which need not be joined. See Magnolia Petroleum Co. v. Storm, Tex.Civ.App., 239 S.W.2d 437.

2. The lease itself permitted such division:
"7. The rights of either party hereunder may be assigned, in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns of the parties hereto, but no change or diversion in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No change in the ownership of the land, or any interest therein, shall be binding on Lessee until Lessee shall be furnished with a certified copy of all recorded instruments, all Court proceedings and all other necessary evidence of any transfer, inheritance or sale of said rights. In event of the assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable among the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. In case Lessee assigns this lease, in whole or in part, Lessee shall be relieved of all obligations with respect to the assigned portion or portions arising subsequent to the date of assignment.

well stated by Professor Wilmer D. Masterson, Jr.: [3]

"For centuries, courts, particularly those exercising equity jurisdiction, have had and have exercised broad discretion on the matter of parties to lawsuits. If justice would be best and most conveniently served by having them brought in, then brought in they should be. By the same yardstick, if justice and convenience can best be served by limiting the controversy to that asserted by plaintiff against the named defendant, then it should be so limited."

■ In the instant case, the Court can do justice between the parties without affecting any party not before the Court, and therefore no indispensable party is absent. See Mackintosh v. Mark's Estate, 5 Cir., 225 F.2d 211, and authorities there collected.

Ten years was the primary term of the lease. It was to continue "as long thereafter as oil, gas or other mineral is produced from the land hereunder." Stanolind drilled a well on Section 4 during the primary term of the lease which came in as a producer and produced from September, 1951 to April 1, 1953. On that date, Stanolind shut in the well because of an order of the Railroad Commission of Texas,[4] which order was held invalid by, the Texas Supreme Court on June 10, 1953. Railroad, Commission of Texas v. Rowan Oil Co., 152 Tex. 439, 259 S.W.2d 173. Meanwhile, however, the Commission had issued an allowable of zero for the months of April, May, June and the first part of July, and on July 1 and 15, 1953, it issued further orders providing that a well could produce only if the casinghead gas was put to one of the four legal uses, specifying such uses by the same language that had been employed in the first order, quoted in footnote 4, supra.

Stanolind claimed that it could not put the casinghead gas that would be produced from this well to any one of those four legal uses, a claim to be later discussed. There was no actual production from the well from April 1, 1953 to January 1, 1954. By the latter date, Stanolind had secured from the Commission an exception to the shutdown order,

3. In his excellent article on "Indispensable Parties in Oil & Gas Litigation" presented before the 1954 Fifth Circuit Judicial Conference.

4. "It is Ordered By the Railroad Commission of Texas that from and after the effective date hereof, no operator of any oil well or of any gas well completed in or that may be completed in the Spraberry reservoir underlying the geographical extent of the Spraberry Trend Area Field located in Midland, Glasscock, Reagan, Upton and Martin Counties, Texas, shall produce or allow to be produced therefrom any oil or gas until such time as gathering and processing facilities of sufficient capacity to adequately handle all the casinghead gas produced in said field is constructed and ready for use and until pipe line capacity is available to take plan residue so as to make available the voluminous casinghead gas now being flared for one or more of the legal purposes as set out for sweet gas in subsection 1 of section 7, Article 6008, Title 102 of the Civil Statutes of this State, which said lawful uses, as therein set out, are as follows:

"(a) Light or fuel.

"(b) Efficient chemical manufacturing other than the manufacture of carbon black.

"(c) Bona Fide introduction of gas into oil or gas-bearing horizon in order to maintain or increase the rock pressure, or otherwise increase the ultimate recovery of oil or gas from such horizon.

"(d) The extraction of natural gasoline therefrom when the residue is returned to the horizon from which it is produced.

"It is the intent and purpose of this order that the production of gas from the reservoir underlying the geographical extent of the Spraberry Trend Area Field shall cease, until such time as the necessary facilities are available for gathering, processing and marketing gas from all wells in said field, or until substantial compliance with this order is shown to the Commission.

"It Is Further Ordered By the Commission that the provision of this order shall become operative and effective as of 7 a. m., April 1, 1953."

and, pursuant thereto, it resumed production, and the well has produced from that time to the date of trial.

The lease contained a further provision as follows:

"If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes hereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or re-working operations within 60 days thereafter."

Stanolind did not commence any additional drilling or re-working operations at any time after the shutdown on April 1, 1953. Instead, on May 29, 1953, it wrote to Mrs. Haby as follows:

"Minnie E. Haby
"Calf Creek, Texas

"As you know, the Railroad Commission of the State of Texas, by shut-down order effective April 1, 1953, has prevented the production of oil or gas from any wells in the Spraberry Trend Area Field until facilities are available to process and market the casing head gas from all the wells in the field.

"Under such circumstances, Stanolind Oil and Gas Company is tendering to you herewith an amount of money equal to the oil royalty which it is believed you would have received had the well located on your property been permitted to produce for the months of April and May, 1953. The Spraberry shut-down order is presently under attack in the Supreme Court of Texas, and we trust that the case will be finally disposed of in June and that production may be resumed upon your property.

"We trust that you will agree to accept the amount of money tendered with the understanding that when production is resumed upon your property such payments will not be subsequently deducted from your royalty interest, and that by

the acceptance of the enclosed check or subsequent checks tendered you the lease under which you own royalty will be considered as having produced oil in sufficient amounts each month to have entitled you to receive the amounts tendered.

"If you agree to accept such, payments upon the terms contained herein, please sign one copy of this letter to signify your acceptance and agreement hereto and return the same to us in the enclosed stamped envelope.

"Very truly yours,
"(S) Wm. J. Nolte.

"Accepted and Agreed To:
· · · · · · · · · · · · ·"

On June 3, 1953, Mrs. Haby replied through her attorneys as follows:

"Gentlemen:

"On behalf of Mrs. Minnie E. Haby, we return your check No. 107083, payable to her order in the amount of Fifty Dollars and Fifty-seven Cents ($50.57) sent with your letter of May 29, 1953.

"Mrs. Haby does not care to accept the check under the conditions stated in your letter of transmittal."

Stanolind continued sending checks to Mrs. Haby, and on September 26, 1953 her attorneys wrote to Stanolind as follows:

"Gentlemen:

"We return your three checks, one dated June 26, 1953 for $27.33, one dated July 24, 1953 for $15.68 and one dated August 25, 1953 for $15.68, all payable to Minnie E. Haby, Calf Creek, Texas.

"We believe that Mrs. Haby previously had advised you that a similar check sent by you would not be accepted for the purpose sent. The checks enclosed will not be accepted for the purpose for which you apparently have sent them.

"There is a certain amount of expense and trouble incident in re-

turning checks to you; therefore, if you send other similar checks to Mrs. Haby and she does not take the trouble of returning them to you, please do not understand from her not returning them that she is accepting them.

"Kindly acknowledge receipt."

Stanolind admitted receiving that letter. Another check dated September 25, 1953 evidently crossed that letter in the mails, and on October 1, 1953 Mrs. Haby endorsed and deposited that check under circumstances described in the margin.[5] The deposit was discovered by Mr. Haby when he came to make out his and his wife's income tax return, and Mrs. Ha-

by, through her attorneys, then tendered the amount back to Stanolind, which refused to accept.

■ None of the foregoing facts are in dispute, though Haby does deny Stanolind's claim that to put the casinghead gas to one of the legal uses specified in the shut-down orders of July 1 and 15, 1953, was impossible rather than economically impracticable. The district court found simply, that, "The testimony in this case shows that the defendant could not put the casinghead gas to any one of the four uses." If that language is definite enough to signify physical impossibility, it is not sustained by the record.[6]

5. "Q. Would you please tell the Court what happened at that time? How came you to deposit that check? A. I don't, know, I was here to see a very sick mother, and I opened my purse and ran in the bank and deposited it. I don't know what made me do it, I just did it.

"Q. Did you intend to ratify any contract or make any contract by your depositing that check? A. No.

"Q. Did you know what check it was you were depositing? A. I did not.

"Q. Were you married at that time, Mrs. Haby? A. Yes.

"Q. I show you this deposit slip marked Defendant's Exhibit 1. Is that your handwriting on that deposit slip? A. It is not.

"Q. Do you know whose handwriting it is? A. It is the teller's at the bank, Mr. Cain deposited that check.

"Q. Was the check in an envelope when you handed it to him? A. Yes.

"Mr. Sailers: We think that is beside the question. She cashed the check, that is admissible.

"The Court: I think both of you are biting at a different cherry that has nothing to do with the big question in this case. He has already offered testimony showing that he didn't want these checks, and there is no estoppel here by reason of this happening. You are just making a big record out of nothing."

6. We quote at some length from the testimony of Mr. Hiltz, a petroleum engineer for Stanolind:

"Q. And, number three: 'Bona fide introduction of gas into oil or gas-bearing horizon in order to maintain or increase the rock pressure or otherwise increase the ultimate recovery of oil or gas from

such horizon.' Could Stanolind have put it to this use? A. No, sir. First, the lease has a single well on it and for that lease it would be physically impossible to inject fluids to produce those concurrently.

"Second, based upon our experience in other areas where the characteristics were similar we concluded that the return of gas to that formation was not feasible.

"Q. And the fourth is: 'The extraction of natural gasoline therefrom when the residue is returned to the horizon from which it is produced.'

"Could you put the gas from this well to that purpose? A. We couldn't at that time.

"Q. Didn't you have a contract with anyone to take the gas from this well there in the first part of 1953, in April, 1953? A. Yes, sir, our gas was dedicated, under contract, to Phillips Petroleum Company.

\*      \*      \*      \*      \*

"Q. Did you ask Phillips to take gas pursuant to this contract from this Sadie J. Weddell well? A. Yes, sir.

"Q. Did Phillips take the gas? A. No, sir, they didn't.

"Q. Did they tell you why they wouldn't take it? A. They told us they had evaluated the desirability and feasibility of coming in and saving that gas and they concluded it would not be economically feasible to do so.

"Q. Under this order of July 14th there were four means by which Stanolind could produce, if they could put the gas to a legal use.

"Under number four—I want you to tell the Court what you did after July

**304**

The questions to be decided are whether Stanolind's lease in so far as it covered Haby's land was terminated because for the nine months from April 1, 1953 to January 1, 1954, during which the well was shut down to comply with the orders of the Railroad Commission, no oil, gas or other mineral was produced from the land, and, if so, whether Mrs. Haby's endorsement and deposit of Stanolind's $15.68 check of September 25, 1953 constituted a recognition and ratification of the lease.

Both parties agree, as they must, that the lease contract "was entered into in contemplation of the right of the Railroad Commission, in the interest of conservation, to control the production of oil wells * * *." Butler v. Jenkins Oil Corporation, 128 Tex. 356, 97 S.W.2d 466, 467; see also, Magnolia Petroleum Co. v. Stroud, Tex.Civ.App., 3 S.W.2d 462; Kingwood Oil Co. v. Loehr, 5 Cir., 200 F.2d 551. With such knowledge, the lease was to continue so long after the primary term "as oil, gas or other min-

15th in order to try to produce this well? A. At the time the Commission issued its order on July 15th they held an emergency hearing. At that hearing we negotiated contracts with other operators in this immediate area of the Spraberry Field with the objective in mind of attempting to develop an outlet for this producing casinghead gas. During this check we contacted other persons in the area and we learned from the El Paso Fuel & Gas Company and the Texas Products Company that they considered it not economically feasible to come into that area and gather our gas, individually or collectively, the entire gas in the field."

On cross-examination, he testified: ·

"Q. During 1953 when the well was shut down it was shut down because the Railroad Commission considered it wasteful, is that correct? A. That is correct.

*     *     *     *     *. ,

"Q. Then this well, under the findings of the Railroad Commission, during all the time it was shut down in 1953, was a wasteful well, that is correct, isn't it? A. Yes, sir, that is correct.

"Q. And the Railroad Commission made certain specifications which could have been met and the well would then not have been a wasteful well, is that correct? A. Yes, sir I believe that was stipulated in their order.

"Q. And your testimony, in effect, is that it just was not practical for Stanolind to meet them in respect to this well? A. It was physically impossible to meet some of them. In effect, it was physically impossible to meet all of the requirements at that time.

"Q. Was it physically impossible for Stanolind to drill another hole and reinject this gas into the same strata from which it was taken? A. It was not physically impossible, it was economically impossible and impracticable.

"Q. Then it was impossible for Stanolind to have drilled a well and reinjected the gas that may have been coming out of this well? A. We certainly could have, physically."

On further re-cross-examination, he testified:

"Q. It was not physically impossible to drill a well and inject gas? A. I said it was physically possible but not economically practicable or feasible."

Mr. Webb, in charge of gas operations for Phillips Petroleum Company, testified:

"Q. When Stanolind made a request of you to take this gas what did you do? A. We made a calculation of what it would require to connect to this gas and due to the distance from our gathering system and the small amount of gas it was not economical for us to run the system into the Weddell area.

"Q. When Stanolind made this request you determined it was not economical? A. Yes, sir.

"Q. Where is your nearest pipe line connection to this Weddell area? A. About eight miles from the center of the Weddell area.

"Q. How many miles of pipe would you have had to lay to get into this area? A. We would have had to have eight miles of main line, which we calculated at that time to be eight-inch, and four miles of gathering line, or collaterals, of four-inch size."

On cross-examination, Mr. Webb testified:

"Q. When Stanolind offered you, or requested you to take this gas, it did it, requesting you to build eight miles of pipe line, is that correct? A. Well, that part was not mentioned, but they assumed that we would take the gas.

"Q. Did Stanolind offer to stand any of the expense of getting the gas into the main lines? A. No, sir, they didn't.

"Q. Then the offer was that you would

eral is produced from said land hereunder", and "if after discovery of oil or gas the production thereof should cease *from any cause*, this lease shall not terminate if Lessee commences additional drilling or re-working operations within 60 days thereafter." (Emphasis supplied.)

██ Under the law of Texas, the lessee's estate created by an oil and gas lease, such as the one in this case, is a determinable fee, and the "thereafter" or "production" clause is a special limitation upon the lessee's estate. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290; Caruthers v. Leonard, Tex.Com.App., 254 S.W. 779; Carrothers v. Stanolind Oil & Gas Co., D.C.N.D.Tex., 134 F.Supp. 191, 193; 7 Texas Law Review 541; see also, 31 C.J.S., Estates, § 10; 19 Am. Jur., Estates, § 28.

> "It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W. 2d 27." Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032.

As said by this Court in Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733,

735, "* * * equitable rule as to relieving against forfeiture has no application to the facts of this case, for there was no forfeiture; there was nothing to be forfeited, because the lease by its very terms had ceased to exist." According to Mr. A. W. Walker's article in 8 Texas Law Review 511:

> "Neither unavoidable delays or accidents, acts of God, unfavorable economic conditions, nor financial difficulties of the lessee will afford an excuse for the failure to comply literally with the provisions of this cause in the absence of an express stipulation otherwise contained in the lease."

It is not clear to us that the Louisiana cases and the Mississippi case relied on by appellee [7] involved determinable fee estates, rather than contractual covenants or obligations. Cf. Restatement of Law of Property, Vol. 4, § 438(h), p. 2555. Each of those cases also involved compulsory pooling of leases into a gas production unit, a matter not chargeable to any fault on the part of the lessee. The orders of the Railroad Commission here involved were intended to prevent waste.[8] Further, in each of the cases cited, more exact performance by the lessee was literally impossible, rather than economically inadvisable as in this case.[9]

---

stand all of the expense and take the gas out of the well, is that correct? A. That is correct."

**7.** Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Hood v. Southern Production Co., 206 La. 642, 19 So.2d 336; Superior Oil Co. v. Beery, 216 Miss. 664, 63 So.2d 115, 64 So.2d 357, 65 So.2d 455.

**8.** "d. Construction factors in determining intent—Type of impossibility. Impossibility of performance of the terms of an otherwise valid restraint may arise in various ways. It may arise out of a volitional act or by reason of a non-volitional occurrence * * *. It may arise out of a situation personal to the person who is to perform, or it may be occasioned by circumstances external to that person * * *. Depending upon the

particular circumstances, the permissible inference as to intent varies with the type or combination of types of impossibility involved. Generally an inference that the testator intended to excuse from performance is not justified where the impossibility arises out of a volitional act of the devisee. Where a volitional act of some third person, or a non-volitional occurrence, or a circumstance external to the person who is to perform, results in impossibility, this fact frequently tends to an inference that non-performance is excused." Restatement of the Law of Property, Vol. IV, § 438(d) p. 2551.

**9.** "If * * * the acts of the public authorities * * * merely make performance more difficult or less profitable, and not impossible, or are of such a nature that they should reasonably have been anticipated, it has been held that

Still further, the parties here provided a saving clause in case production ceased *"from any cause"*.[10] In such event, to avoid the termination of the lease, the lessee must "commence additional drilling or re-working operations within 60 days thereafter." It was possible for Stanolind to comply with that requirement, but it did not. The fact that additional drilling was economically impracticable is no excuse. Watson v. Rochmill, supra; Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S.W.2d 395, 399; see also, 11 Texas Law Review, pp. 420, 421. The lease fixed precisely enough the conditions upon which its continuance depended, and compliance with such conditions was not excused by the acts of the Railroad Commission heretofore described. Gas Ridge v. Suburban Agricultural Properties, 5 Cir., 150 F.2d 363, 364, 365; Dunbar v. Fuller, Tex.Civ. App., 253 S.W.2d 684, 687.

Woodson Oil Co. v. Pruett, Tex.Civ. App., 281 S.W.2d 159, is similar to the present case. Therein plaintiffs sought an adjudication that an oil and gas lease had terminated by reason of cessation of production for more than 60 days.[11] Defendants who had lost in the trial court contended that the cessation was temporary. The following excerpt from the opinion in that case, as well as the authorities set forth therein, support our ruling here:

"Appellants next contend that the cessation of production on the lease was sudden and only temporary, and that under such circumstances they were entitled to a reasonable time in which to remedy the defect and resume production. This might be true under the terms of some leases, but under the lease here the parties agreed and stipulated what would constitute temporary cessation. The lease provides, in effect, that if production should cease the lessee must commence re-working or additional operations within sixty days or the lease would terminate. If the cessation of production is for more than sixty consecutive days it is not to be regarded as temporary under the terms of this lease. If re-working or additional operations are not begun within the sixty-day period the lease terminates by its own provisions. Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311; St. Louis Royalty Co. v. Continental Oil Co., 5 Cir., 193 F.2d 778; 28 Tex.Law Rev. 895; McQueen v. Sun Oil Co., 6 Cir., 213 F.2d 889." Woodson Oil Co. v. Pruett, supra, at pages 164, 165.

Mrs. Haby's endorsement and deposit of Stanolind's $15.68 check of September 25, 1953 was obviously an inadvertence and not intended as a recognition or ratification of the lease.[12] Further, at that time, production had ceased for a time longer than 60 days, Stanolind had failed to comply with the requirement to commence additional drilling or re-working operations, and Mrs. Haby had expressly refused to waive the effect of the cessation of production; in short, the lease had already terminated. Her endorsement and deposit of the check thereafter, without her husband's joinder, could not and did not suffice to make a new lease or to reinstate the terminated lease. Aside from the fact that Mrs. Haby was a married woman, mere acceptance of a royalty payment did not of itself amount either to a ratification of an oil and gas lease which had theretofore terminated, nor to an estoppel to assert such termination. Reference is

they are not available as a defense to an action for breach of the contract." 12 Am.Jur., Contracts, § 379, p. 956.

10. We do not mean to imply that Stanolind had a right to rely on that clause if the cause of production ceasing was of its own volition.

11. The 60 day periods in the two leases were not identical; however, each gave the lessee 60 days within which to resume operations.

12. The district court so indicated in its remarks quoted at the end of footnote 5, supra.

again made to the Woodson case, supra, and to the authorities therein cited. The court, in disposing of a similar contention, said:

"There is no principal of forfeiture involved when a lease is terminated by its own provisions for cessation of production. 7 Tex.Law Rev. 8, also page 530; Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Flato v. Weil, Tex.Civ. App., 4 S.W.2d 992; Heard v. Nichols, Tex.Com.App., 293 S.W. 805; Stephenson v. Calliham, Tex.Civ. App., 289 S.W. 158.

"In Gas Ridge v. Suburban Agricultural Properties, 5 Cir., 150 F.2d 363, at page 365, the Court said:

"'As to waiver and estoppel, plaintiff did nothing in any way to mislead defendant or even to induce it to develop the property. It only took the meager pittance defendant from time to time sent it, and it seems to be well settled in the law that the mere receipt of payments on account of minerals taken from one's own property does not operate as a waiver of, or an estoppel to assert, the claim that the rights of the taker as lessee have terminated.'" Woodson Oil Co. v. Pruett, supra, at page 164.

As Mrs. Haby was a married woman, and as the lease had ceased to exist, no act short of a written instrument, correctly acknowledged, could revive the lease as to her, either by ratification or by estoppel, in the absence of active fraud upon her part. Humble Oil & Refining Co. v. Downey, 143 Tex. 171, 183 S.W.2d 426. The elements of estoppel present in Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355, 361, and Buchanan v. Sinclair Oil & Gas Co., 5 Cir., 218 F.2d 436, 440, do not exist in this case.

We hold that, in so far as it covered Haby's land, the lease had terminated

prior to the filing of suit. The judgment is, therefore, reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.