Jay C. WILSON et al *v.*
Floydena M. TALBERT et al

75-327                                          535 S.W. 2d 807

Opinion delivered April 5, 1976
[Rehearing denied May 17, 1976.]

536

*Keith, Clegg & Eckert,* for appellants.

*McKay, Chandler & Choate,* for appellees.

J. FRED JONES, Justice. This is an appeal from a chancery court decree canceling an oil and gas lease. The appellee Talbert[1] owned an undivided three-fourths mineral interest and Mrs. Haltom owned the other one-fourth interest in a tract of land in Ouachita County and they executed separate leases to the appellants covering their respective interests. The primary term of the Talbert lease was two years and that of the Haltom lease was three years. The leases were executed in 1964 and 1965 and an oil producing well was drilled by the appellants. The well continued to produce and royalties were paid under the lease contracts until in March, 1974, when a leak developed in the bottom of one of the appellants' 500 barrel storage tanks and production from the well was discontinued.

The Haltom lease simply provided that it would remain in force for a term of three years from its date and as long thereafter as oil and gas, or either of them, was produced from the land by the lessee. The pertinent provisions of the Talbert lease provided as follows:

"Subject to the other provisions herein contained, this lease shall remain in force for a term of two (2) years

---

[1]Both Mr. and Mrs. Talbert were parties but will be referred to in the singular.

from this date (herein called 'primary term') and as long thereafter as oil and gas, or either of them, is produced from said leased premises or drilling operations are continuously prosecuted as hereinafter provided. 'Drilling operations' includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production or oil or gas; and drilling operations shall be considered to be 'continuously prosecuted' if not more than 60 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, after the expiration of the primary term of this lease, oil or gas is not being produced from the leased premises but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted; and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced from the leased premises. If, after the expiration of the primary term of this lease, production on the leased premises should cease, this lease shall not terminate if lessee is then prosecuting drilling operations, or within 60 days after each such cessation of production commences drilling operations, and this lease shall remain in force so long as such operations are continuously prosecuted, and if production results therefrom, then as long thereafter as oil or gas is produced from the leased premises.''

The so-called *force majeure* clause in the Talbert lease reads as follows:

"All express and implied covenants of this lease shall be subject to all applicable laws, government orders, rules and regulations. This lease shall not be terminated in whole or in part, nor lessee held liable in damages because of a temporary cessation of production or of drilling operations due to breakdown of equipment or due to the repairing of a well or wells, or because of failure to comply with any of the express or implied covenants of this lease if such failure is the result of the exercise of governmental authority, war, lack of market,

act of God, strike, fire, explosion, flood or any other cause reasonably beyond the control of lessee.''

On September 23, 1974, Talbert filed petition for cancellation of the lease as a cloud on his title. He alleged that there had been no production from the lease since March, 1974, and no royalty paid since February, 1974; that the lease had expired and had not been renewed. He alleged that he had made demand for release under Ark. Stat. Ann. § 53-313 (Repl. 1971); that his demand had been ignored; that the lease constituted a cloud on his title and he prayed that his title be quieted. By amendment to Talbert's petition, Haltom prayed the same relief as to her undivided one-fourth interest.

The appellants filed answer and counterclaim denying that the lease had expired. They alleged the rupture in a storage tank and the difficulties encountered in repairing it as the reason for cessation of production. They alleged that when they sought entry to the premises in July, 1974, in an attempt to repair the tank, that Talbert refused them permission to enter; that his conduct estopped him from enforcing a forfeiture and that they were damaged in the amount of more than $1,000 per month because of such refusal. They prayed for a restraining order and for damages.

On October 30, 1974, the chancellor entered a temporary restraining order permitting the appellants to enter the premises for repair of the tank and to restore production and, following a hearing on the merits, the chancellor rendered a letter-form memorandum opinion reciting in part as follows:

"It is clearly stated in the Talbert lease that after the expiration of the primary term if the lease is not producing and within sixty days after cessation of production the lessee does not 'commence drilling operations' the lease terminates by its own terms. The attorneys cited no Arkansas cases construing this provision in a lease and I have found none, however, I have found several cases from other jurisdictions construing similar provisions. These cases hold that the leases terminated by their own terms at the end of the stated period of time. *McQueen* v.

*Sun Oil Company, et al,* 213 F. 2d 889 (Ky. 1954); *Haby* v. *Stanolind Oil and Gas Company,* 228 F. 2d 298 (Tex. 1955); *Loeffler* v. *King,* 228 S.W. 2d 201 (Tex. 1950); *Francis et al* v. *Pritchett et al,* 278 S.W. 2d 288 (Tex. 1955). Also see *House et al* v. *Tidewater Oil Company, et al,* 219 So. 2d 616 (La. 1969).

The Haltom lease does not have a sixty days provision but is for a term of three years and as long thereafter as oil and gas is produced. The Supreme Court of Arkansas considered a similar question in the case of *Reynolds* v. *McNeill,* 218 Ark. 453, 236 S.W. 2d 723 (1951). * * * The Supreme Court stated than when a lessee's estate has vested it does not automatically terminate upon the temporary cessation of production, and that most authorities allow the lessee a reasonable time within which to reinstate paying production. The Court has not stated the number of days that constitutes a reasonable time, but has stated that it depends on the facts and circumstances in each case. In my opinion the lessees in this case did attempt within a reasonable time to reinstate paying production, and the Haltom lease should not be terminated."

The chancellor entered a decree in accordance with his findings and ordered an accounting for oil produced under the Talbert lease after its termination. There is no appeal from the chancellor's decree as to the Haltom lease but as to the Talbert lease, the appellants contend that the chancellor "erred in declaring a forfeiture of the Talbert lease under the 60-day clause."

The appellants argue that since the chancellor found the cessation of production was of such temporary nature and reasonable effort to reinstate production sufficient to prolong or keep in force the Haltom lease, the question on this appeal is narrowed to,

"(1) whether the language of the *force majeure* clause prevented the lease from terminating because of the temporary cessation of production due to the breakdown of equipment; if not, (2) whether the 60-day clause contained in the Talbert lease should be con-

strued as dealing with a production cessation of a temporary nature as here involved; and, in any event, (3) whether the efforts to restore production complied with the provisions of the 60-day clause."

As we interpret the first above provision of the lease which twice contains the so-called "60-day clause," it refers to cessation of production because of depletion or threatened depletion of the well or wells rather than a temporary cessation because of such things as temporary lack of storage facilities. The wording of this provision is somewhat ambiguous but it evidently refers to a threatened *permanent* cessation which can be averted only by extensive measures such as the drilling of a new well or the reworking or deepening or plugging back of an existing well.

As we interpret the "*force majeure* clause," it applies to *temporary* cessation of production as a result of causes beyond the control of lessee such as the ones therein set out. In this provision the parties fixed no minimum time, such as 60 days, in which to reinstate production because, obviously, the nature and extent of the breakdown, or cause of cessation or production, would govern the time required for making the necessary repairs or eliminating the cause of cessation of production. The length of such necessary time, in the absence of agreement to the contrary, could only be measured by such time as would be reasonable under the facts and circumstances of the particular case.

The appellants argue that "the question on this appeal is narrowed to whether the language of the *force majeure* clause prevented the lease from terminating because of the temporary cessation of production due to the breakdown of equipment." It is our view, however, that the question, under the *force majeure* clause, is narrowed to whether the time involved in making the necessary repairs and restoring production was reasonable under the facts and circumstances of this case and, upon review of the evidence de novo, we conclude that it was not.

The rupture in the tank bottom occurred in March and apparently there was no effort made to repair it until July. Furthermore, there was evidence to the effect that another

storage tank stood adjacent to the damaged one and that it could have been utilized by simply opening or closing valves, following minor repairs.

The rule is well established that on trial de novo in chancery cases, the chancellor's decree will be affirmed if it appears to be correct upon the record as a whole, even though the chancellor may have given the wrong reason for his conclusion. *Morgan v. Downs,* 245 Ark. 328, 432 S.W. 2d 454 (1968); *James v. Medford,* 256 Ark. 1002, 512 S.W. 2d 545 (1974).

The decree is affirmed.