**W. M. INMAN and Frances Inman, his Wife, Plaintiffs,**

v.

**The MILWHITE CO., Inc., Defendant.**

**No. LR–66–C–121.**

United States District Court
E. D. Arkansas, W. D.

Dec. 28, 1966.

Ted G. Boswell, Bryant, Ark., for plaintiffs.

George Pike, Jr., Little Rock, Ark., for defendant.

## Memorandum Opinion

HENLEY, Chief Judge.

This is a suit in equity brought by plaintiffs, citizens of Arkansas, against the defendant, a Texas corporation having its principal place of business in that State, but licensed to do business and doing business in Arkansas, to cancel a soapstone mining lease covering 160 acres of land in Saline County, Arkansas, belonging to plaintiff W. M. Inman.

The suit was commenced in the Chancery Court of Saline County and was removed here by the defendant on allegations of diversity of citizenship and the existence of an amount in controversy in excess of $10,000, exclusive of interest and costs. 28 U.S.C.A. §§ 1332 and 1441(a).

In due course, plaintiffs filed a motion to remand alleging that the amount in controversy is less than $10,000, and that the Court lacks subject matter jurisdiction.

The jurisdictional question has been heard in open court and has been submitted on oral testimony, documentary evidence, and memorandum briefs.

■ The burden, of course, is upon the defendant to establish the existence of jurisdiction. To carry that burden defendant relies on the testimony of Albert J. Hess, the manager of its plant at Bryant, Arkansas, and of C. V. Barnes, a qualified real estate counsellor and appraiser; defendant also relies on photographic and other documentary evidence. Plaintiffs called no expert witness and rely on their cross-examination of defendant's witnesses and on the testimony of W. M. Inman.

The original lease was executed in 1951 and granted to defendant the right to explore for, mine, and remove soapstone, talc, bentonite or other similar clays in and upon the leased premises; to erect power houses and other appropriate structures; and to lay and remove gas and oil pipelines, together with full right of ingress to and egress from the leased premises. In addition to a nominal consideration of $10.00 cash in hand paid to lessors, the lessee became obligated to pay a royalty of fifty cents a ton on all ore removed from the premises, provided that there should be a minimum annual royalty of $600 per year, which is the equivalent of fifty cents a ton on 1,200 tons of ore.

The primary term of the lease was five years from January 15, 1952, and for as long thereafter as ore was produced in paying quantities, provided that if at the end of the five-year period ore was being produced in paying quantities, the lease should remain in force indefinitely regardless of actual production provided that the minimum royalty was paid from year to year.

The lease provided that for royalty purposes tonnages should be determined

on the basis of railroad weights at point of shipment.[1] The minimum rentals are payable annually in advance.

Following the execution of the lease defendant went upon the premises and conducted explorations which resulted in the uncovering of an ore body estimated by Mr. Hess, a qualified expert, as containing 122,458 tons of ore. The pit in which this ore body is contained covers 50,050 square feet of surface area or about an acre and a quarter. There may or may not be other workable ore bodies underlying other portions of the leased acreage.

The cost of developing the pit above mentioned incurred during 1952, 1953, and 1954 amounted to $42,203.65 in cash outlay, according to defendant's Exhibit 4 which is a summary exhibit taken from the books and records of the defendant and which the Court does not question.

Defendant's Exhibit 3, another summary exhibit, reflects that from 1951 through 1966 there have been mined from the Inman pit 59,893.92 tons of ore, and that an estimated 62,564.08 tons remain in the pit. The 59,893.92 tons represent ore hauled from the premises and on which royalty was paid.

Exhibit 3 further reflects that royalty was paid on less than 1,200 tons of ore actually mined in 1964 and 1965, although the minimum royalty of $600 per year was paid. The tonnage hauled in 1966 up to the time of trial was 1,339.07 tons, part of which was hauled after this suit was filed. The heaviest mining took place in 1956, 1957, 1958, and 1959; mining declined very sharply in 1960, 1961, and 1962, was up a little in 1963, but was down to 794.39 tons in 1964. The tonnage removed in 1965 was 1,192.54, a figure below the 1,200 tons which, as stated, constituted the basis for the minimum royalty.

In the course of the operations down through the years some inferior ore was removed from the ground and stockpiled on the lease without any royalty being paid on it at the time. Mr. Hess testified that he stored this ore because he thought that in time he might find a use for it, and that use for some of it has been found. During the last three years all of the ore hauled from the lease by defendant has come from the stockpiles. There are now about 3,000 tons of ore left in the stockpiles.

The Inman property is located in the northeastern part of Saline County, Arkansas, near the Pulaski County line. It is about 10 miles north of the City of Benton and lies on both sides of a black-topped highway which runs north from Benton and eventually connects in Pulaski County with the 12th Street Pike, a road running west out of the City of Little Rock. About 40 acres of the tract are uncleared; there are two lakes on the property which cover about 20 acres;[2] the cleared land is not suitable for row crops, and its best use agriculturally is for hill pasture. Mr. Inman in fact runs some cattle on it.

According to the testimony of Mr. Barnes, were the property free of the lease, its highest and best use would be for a suburban rural homesite. Again according to Mr. Barnes, that use cannot be realized because of the rights of the defendant under its lease.

Mr. and Mrs. Inman are of advancing years; they have an adult son to whom they would like to give the property so that he can build a home on it, but due to the existence of the lease they have not been able to achieve their purpose.

The gist of the complaint is that defendant has breached the lease in a number of ways, and that plaintiffs are entitled to cancellation. The principal alleged breach relied upon is the asserted

1. At that time defendant had not established a plant at Bryant, and ore was shipped to defendant's plant in Houston, Texas. Since the establishment of the Bryant plant some years ago, tonnages are measured at that plant.

2. It is not clear whether the lakes will support fish life; they probably will not at this time.

failure of defendant to exploit the property actively for the past several years and the action of the defendant in holding the lease by paying the minimum royalties. That conduct is said to be wrongful.

In its answer the defendant denies that it has been guilty of any breach, and its position is that it is simply exercising its rights under the contract.

The removal petition simply alleged in general terms that the amount in controversy here is in excess of $10,000; the motion to remand simply alleges that the requisite amount is not involved. Neither the removal petition nor the motion reveals any particular theory with respect to the presence or absence of jurisdictional amount.

However, on August 5, 1966, Mr. Hess filed an affidavit in opposition to the motion. In the affidavit he asserted that "the value (of the ore in place) to plaintiffs, considering only the 50¢ per ton royalty provided in the lease, is $12,500 to $17,500." He also stated that defendant had spent in excess of $10,000 in uncovering the ore, and that "the money so spent would be lost by The Milwhite Company if the lease were terminated." He stated still further that the foregoing valuations did not consider the value of uncovered ore.

After considering the Hess affidavit, the Court afforded plaintiffs an opportunity to file a controverting affidavit. After some delay there was filed on September 30 the affidavit of Mr. Inman. The Inman affidavit, after referring to the alleged fact that defendant had not mined the property since 1963 and had used it merely as a storage depot, went on to say that affiant believed that plaintiffs would receive far less than $10,000 from the defendant by reason of royalties on exposed ore, and that affiant believed that defendant had already realized a profit from its operations on the property far in excess of what had been expended for exploration and development.

It appeared to the Court that when the Hess affidavit and the Inman affidavit were read together, they did not really contradict each other, but that neither affidavit actually reached the point in controversy. On October 6 counsel were so advised by letter. In that letter the Court expressed the tentative view that the suit was analogous to an action to remove a cloud on title in which type of action jurisdictional amount is generally measured by the difference between the value of the property subject to the cloud and its value free of the cloud. It was pointed out that the affidavits did not purport to show what the Inman property is worth subject to the lease or what it is worth free and clear of the lease. The Court stated that it could not resolve the jurisdictional question on the affidavits before it, and that additional affidavits would have to be submitted or an evidentiary hearing held. Counsel were requested to advise the Court as to whether they disagreed with the Court's tentative view as to the measure of jurisdictional amount and indicated that briefs might be desired if either side did not find itself in agreement with the Court.

Counsel for defendant indicated that he did not entirely agree with the Court's suggestion as to the measure of jurisdictional amount and that he would like to look into the matter further. Just before the hearing counsel submitted a letter brief in which he stated that while the measure of jurisdictional amount suggested by the Court was a "proper measure," nevertheless such amount in a case of this kind is also properly measurable by the amount of the loss which defendant would suffer should the lease be cancelled, and that such loss would be in excess of $10,000.

In the meantime the Court had been studying the matter on its own account and had found that there is uncertainty in the law as to how jurisdictional amount is to be measured in a suit where the gain to the plaintiff and the loss to the defendant resulting from the outcome of the case do not correspond to each

other.[3] That problem, of course, does not ordinarily arise in suits for money judgments because in such cases the plaintiff's gain is usually the defendant's loss, and it makes no difference whether jurisdictional amount is measured from the viewpoint of the plaintiff or from the viewpoint of the defendant; from either standpoint, the amount in controversy is either more or less than $10,000. But the problem does frequently arise in equity cases where plaintiff's gain, expressed in monetary terms, does not correspond to defendant's loss.

The subject is discussed in some detail in Wright, Handbook On The Law of Federal Courts, § 34, pp. 98–100. The author points out that in such a case jurisdictional amount may be measured from the viewpoint of the plaintiff alone, that his gain is the yardstick of measurement, and that defendant's loss is to be disregarded. And he recognizes that there is authority to the effect that jurisdictional amount must be measured by this "plaintiff's viewpoint" rule. See also 1 Moore's Federal Practice 2d ed., ¶ 0.91, p. 827.

Wright argues convincingly, however, that the plaintiff's viewpoint rule has not been established authoritatively as the exclusive rule, although it is, of course, a proper rule in many cases, and that there are at least two other rules which have been applied. One of those rules is that if either plaintiff's gain or defendant's loss is in excess of $10,000, jurisdiction is present. He cites a number of cases applying that rule, including Ronzio v. Denver & R. G. W. R. R. Co., 10 Cir., 116 F.2d 604, and Ridder Bros. v. Blethen, 9 Cir., 142 F.2d 395. The other of those rules is that jurisdictional amount is measured from the standpoint of the party invoking federal jurisdiction; thus, in a suit brought originally in federal court the plaintiff's viewpoint rule would be applied, and in a removed action the possible loss to the defendant would be considered. The author says that "a few district court decisions" support that rule, and he cites Thomas v. General Electric Co., W.D.Ky., 207 F.Supp. 792; Martin v. City Water Co., W.D.Mo., 197 F. 462; Amelia Milling Co. v. Tennessee, C., I. & R. Co., CC Ga., 123 F. 811.

Of the three rules which have been mentioned, Professor Wright prefers the one which is to the effect that jurisdiction is present if the potential financial consequence to either side is in excess of $10,000. He says that this is the desirable rule because "the purpose of a jurisdictional amount, to keep trivial cases away from the court, is satisfied when the case is worth a large sum to either party." Wright, op. cit., p. 100.

As far as the Eighth Circuit is concerned, it is perhaps fair to say that our Court of Appeals is not committed to any one rule to the exclusion of all others. Certainly, it is not committed to the plaintiff's viewpoint rule. As pointed out in defendant's letter brief which has been mentioned, there is language in Miller v. First Service Corporation, 8 Cir., 84 F.2d 680, 681, 109 A.L.R. 1179, and in Cowell v. City Water Supply Co., 8 Cir., 121 F. 53, 57, which would indicate that the Court of Appeals favors the rule preferred by Professor Wright. It is to be noted, however, that in *Miller* jurisdictional amount was absent from the standpoint of both plaintiff and defendant, and in *Cowell* the plaintiff's viewpoint was made to govern in fact.

---

3. The Court will say at this point that the consequences of litigation discussed in this memorandum are the pecuniary consequences to either party of the principal claim asserted by the plaintiff against the defendant. The Court is not considering the problem of jurisdictional amount which can arise by reason of a counterclaim filed by a defendant. That problem is discussed in Wright, Handbook of the Law of Federal Courts, § 37. Arkansas federal cases dealing with that problem include Wheatley v. Martin, W.D. Ark., 62 F.Supp. 109; Trullinger v. Rosenblum, E.D.Ark., 129 F.Supp. 12; Ingram v. Sterling, W.D.Ark., 141 F. Supp. 786.

In the recent case of Hedberg v. State Farm Mutual Auto Insurance Co., 8 Cir., 350 F.2d 924, Judge Blackmun took occasion to restate general principles governing the determination of jurisdictional amount, 350 F.2d at pp. 928–929. He pointed out that it has been said that statutes vesting diversity jurisdiction in the federal courts are to be construed strictly; that the determination of jurisdictional amount is a federal question; and that where a money judgment is sought, the amount in controversy is the sum claimed by the plaintiff if the claim is apparently made in good faith unless, as a matter of law, plaintiff cannot recover so large a sum. He then went on to say that in a replevin action where title to property is involved, jurisdictional amount is determined by the value of the property in controversy. The same rule would seem to apply in a suit in ejectment where title to land is in controversy.

As to injunctions, it was said that the amount in controversy "may" be tested by the value of the right sought to be gained by plaintiff, but that "cost to the defendant" has been "suggested" as an alternative basis.

█ From its consideration of the problem this Court has come to the conclusion that the plaintiff's viewpoint rule should not be applied automatically or exclusively in cases in which the choice of viewpoint is significant in relation to the presence or absence of jurisdictional amount. The Court thinks that when what a plaintiff stands to gain and what a defendant stands to lose are unequal, and where federal jurisdiction is invoked by the party standing to gain or lose more than his adversary the greater gain or the greater loss should be applied as the criterion of jurisdictional amount.

██ Returning now to the jurisdictional problem presented in the instant case, the Court has no difficulty in finding that if jurisdictional amount is measured from the viewpoint of the removing defendant, the amount in controversy is in excess of $10,000, exclusive of interest and cost. Ignoring entirely the undeveloped portion of the leased premises, if the Inman lease is cancelled, defendant will lose its right to remove and process the balance of the uncovered ore body and will also lose that portion of its exploration and development costs which it has not recovered in the application of accepted accounting principles. In other words, defendant will lose its lease, and Mr. Barnes testified without contradiction that the value of the leasehold estate was $21,500. Although the Court has some difficulty with that particular figure, the Court is convinced that the lease is worth at least a sum in excess of $10,000.

█ As has been indicated, the Court tentatively characterized this case as being one analogous to a suit to remove a cloud on title. In such a case there is abundant authority that the difference between the value of the property free of the cloud and its value subject to the cloud is a permissible measure of jurisdictional amount. A. C. McKoy, Inc. v. Schonwald, 10 Cir., 341 F.2d 737; see also 1 Moore op. cit. ¶ 0.95, p. 864, and cases there cited. Such a rule would seem to employ the plaintiff's viewpoint.

In the course of the hearing defendant undertook to prove, as an alternative measure of the amount in controversy, that the difference between the fair and reasonable market value of the Inman property free and clear of the lease and its reasonable market value subject to the lease is more than $10,000.

Mr. Barnes testified in substance that suburban residential use of the property and the mining use thereof are inconsistent uses. That the highest and best use of this property free of the lease is as a suburban homesite, and that in his opinion the reasonable value of the property for that use, assuming cancellation of the lease, is $20,000.

With regard to the market value of the property subject to the lease, Barnes took the position that in view of the broad rights of the lessee, the most significant of which have been mentioned, a reasonable buyer would not be willing to pay

for anything but the right to receive the minimum royalties of $600 per year with the possibility that the defendant would at some time abandon the lease before the availability of the land for surface use was entirely destroyed. Using a capitalization approach, Barnes determined that the present value of an income of $600 per year over a 50-year period would be $6,000, to which he added $2,000 for contingencies, including the possibility of a reversion, and expressed the ultimate opinion that the fair and reasonable value of the property subject to the lease is $8,000.

If the testimony of Mr. Barnes is accepted, the difference between the value of the property free of the lease and its value subject to the lease is $12,000, which is $2,000 in excess of the federal jurisdictional minimum.

The Court has no trouble with Mr. Barnes' high figure of $20,000. The Court has great difficulty with his low figure of $8,000, although, as stated, his testimony was not contradicted by that of any expert or by that of Mr. Inman.

The Court's difficulty is not with Mr. Barnes' mathematical calculations. Rather, the Court's problem is with the assumption indulged by Barnes that a reasonable buyer, able and willing to buy but not required to buy, would not have taken into consideration in the summer of 1966 any factor of value of the Inman property other than the right to receive the minimum royalties and the possibility of a reversion of the leasehold estate. An overly cautious or an extremely cautious buyer might take that approach, but the Court does not think that a reasonable buyer would necessarily do so.

It does not follow from the fact that the leased property may not now be available for use as a suburban homesite or be saleable for that purpose that the property has no surface use or surface value. While it is true that the lessee might begin immediately to exploit the property with vigor and might prosecute its exploitation so as to destroy its availability for surface uses within the near future, there is no reason to believe that such will be done. It appears to the Court that this property now has and will continue to have for quite some time to come a substantial availability for grazing purposes at least, and the Court thinks that a reasonable buyer and a reasonable seller would take that availability into consideration in agreeing upon a sale price for the property.

It is not incumbent on the Court to value the property precisely. If jurisdiction is to be sustained upon the theory that there is a difference of more than $10,000 between the value of the property free of the lease and its value subject to the lease, the burden is on the defendant to establish the existence of that difference by a preponderance of the evidence, and in the Court's eyes that burden has not been discharged.

As has been indicated, jurisdiction of the case will be retained on the theory that the case was brought here by the defendant and that from the defendant's viewpoint the amount in controversy is more than $10,000.

The motion to remand will be overruled, and the case is now subject to being set for trial on the merits.