W. M. INMAN and Frances Inman,
his wife, Plaintiffs,

v.

The MILWHITE CO., Inc., Defendant.

No. LR–66–C–121.

United States District Court
E. D. Arkansas, W. D.

Nov. 30, 1967.

Ted Boswell, of Cockrill, Laser, McGehee, Sharp & Boswell, Little Rock, Ark., for plaintiffs.

George Pike, Jr., of Smith, Williams, Friday & Bowen, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a suit in equity to cancel a mineral lease covering 120 acres of land in Saline County, Arkansas, the property of plaintiff W. M. Inman. Mr. Inman and his wife, who joins him as a plaintiff, are individual citizens of Arkansas; the defendant, hereinafter at times called Milwhite, is a Texas corporation having its principal place of business in that State. The suit was filed in the Chancery Court of Saline County, Arkansas, and was removed to this Court. In connection with a motion to remand the Court found that the amount in controversy is in excess of $10,000, exclusive of interest and costs. Inman v. The Milwhite Co., E.D.Ark., 261 F.Supp. 703.

The case has now been tried on the merits. The record includes the evidence produced in the course of the hearing on the motion to remand and additional evidence introduced at the trial. At the close of the trial the Court invited counsel to submit briefs; those briefs have now been filed and considered. This memorandum incorporates the Court's findings of fact and conclusions of law.

In 1952 plaintiffs executed in favor of defendant a mining lease which authorized defendant to explore for, mine, store, and remove soapstone [1] and related clays from the leased premises. The lease also gave the defendant the right to make certain uses of the leased premises ancillary to the mining operation. The lease called for royalties of fifty cents per short ton of ore, railroad weights, removed from the premises. In addition, defendant was required to pay annually in advance a minimum royalty of $600 which is the equivalent of the tonnage royalty on 1200 tons of ore; the advance royalty was to be credited against actual royalties earned during each lease year.

---

[1]. According to the dictionary, soapstone is a form of talc; it has a number of industrial uses, including use as a base for insecticides.

The lease provided for a primary term of five years ending in January 1957. The lease also provided for an extended term if production of ore in "paying quantities" was achieved during the primary term, and if the lease was producing in paying quantities at the end of the primary term. Under the terms of the lease Milwhite had a right to cancel it at will and free itself from all obligations to plaintiffs, except those which had actually accrued at the time of cancellation.

Since the controversy between the parties largely involves the provisions of the lease just mentioned, which provisions appear in Paragraphs 2, 7, and 10 of the lease, the Court considers it well to set out those provisions at this point insofar as they are here pertinent.

"2. Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from January 15, 1952, and for as long thereafter as soapstone, talc, bentenite or other similar clays shall be produced from said land in paying quantities, and if such soapstone, talc, bentenite or other similar clays shall be produced from said land in paying quantities during the five (5) year term hereof and is so producing at the end of the five (5) year term, then this lease shall remain in force as long thereafter as long as the minimum royalties provided for herein are paid or tendered to Lessor, and/or as long as paying quantity production of soapstone, talc, bentenite or other similar clays is continued."

"7. * * * Notwithstanding any of the other terms, provisions or conditions of this lease, the Lessee may at any time execute and deliver to Lessor, or place of record in the office of the County Clerk of the County in which said lands are situated, a release covering all, but not less than all, of the above described lands, and thereby surrender this lease and be relieved of all obligations hereunder such as has accrued prior to such surrender."

"10. Notwithstanding anything to the contrary contained herein, Lessee shall have the right to terminate this lease as provided by in Paragraph 7 hereof or to keep this lease in full force and effect during the five-year term hereof, and if such production should cease for any cause at any time hereafter during the five-year term hereof, Lessee shall have the right to keep this lease in full force and effect during the five-year term hereof and following the five-year term hereof if such soapstone, talc, bentonite or other similar clays is being produced in paying quantities during and at the end of the five-year term by the payment of the agreed minimum annual royalty, said payment to be made on or before the 15th day of January of each year, whether to the Lessor in person or by depositing or tendering the same to his credit in the Benton State Bank of Benton, Arkansas, and the minimum royalty, if so paid or tendered as above set out, shall be in lieu of all development of operation of the premises for the year for which it is paid, but shall not relieve the Lessee from the obligation to pay to the Lessor any royalties accruing during that year in excess of the agreed minimum royalties."

A commercial deposit of soapstone was opened on the leased property, and by the end of 1966, 59,893.92 tons of ore had been mined and removed from the property. It is estimated by the defendant that 62,564.08 tons remain in what is known as the "Inman Pit." There may or may not be other commercial deposits of ore underlying the surface of the Inman land.

Milwhite is not itself a mining company, at least as far as its Arkansas operations are concerned. It is a processing and selling company, and it contracts with others for the extraction of the ore from the ground and for the hauling of it to the defendant's mill located in the town of Bryant in Saline County. The contractors are paid $2.35 per ton for the delivered ore; they pay their own expenses.

There is no major dispute about tonnage and royalty figures for the several years during which the lease has been in effect. Relevant figures through calendar year 1965 are as follows:

|  | TONS | AMT. ROYALTY |
|---|---|---|
| Oct. 24, 1951 through May 31, 1955 | 4,402.32/tons | $2,201.16 |
| June 1, 1955 through Dec. 31, 1955 | 3,075.48/tons | 1,537.74 |
| 1956 | 10,289.44/tons | 5,144.72 |
| 1957 | 11,596.63/tons | 5,795.32 |
| 1958 | 9,287.25/tons | 4,643.63 |
| 1959 | 9,491.77/tons | 4,745.88 |
| 1960 | 2,940.95/tons | 1,470.47 |
| 1961 | 1,237.33/tons | 618.67 |
| 1962 | 1,777.78/tons | 888.88 |
| 1963 | 2,467.74/tons | 1,233.87 |
| 1964 | 794.39/tons | 600.00 |
| 1965 | 1,192.54/tons | 600.00 |

Actually, no ore has been dug from the Inman pit for several years; the ore removed during recent years has come from a stockpile of ore accumulated during prior years.

Mr. Inman accepted royalties, including minimum royalties, through 1965; he refused to accept the advance royalty for 1966 and commenced this suit in the summer of that year.

It is undisputed that the lease remained in force after the end of the five-year primary term, and the ultimate question for decision here is whether plaintiffs are entitled by means of this action to put an end to the extended term. The controversy involves a construction of the extended term provisions of the lease, which have been quoted, and a question of whether the lease is valid if the extended term provisions are construed in a certain manner. There may be some dispute about whether ore was being taken from the Inman property in "paying quantities" when the suit was filed, and there are certain other issues between the parties.

The Court finds it convenient to state in detail and discuss the issues under the following headings: I. The "Paying Quantities" Issue. II. Construction of the Extended Term Provisions of the Lease. III. Validity of the Lease as Construed. IV. Breach of an Alleged Implied Covenant to Develop. V. Other Alleged Breaches of the Lease and Alleged Misuse of the Inman Property.

### I. The "Paying Quantities" Issue.

It is far from clear that the Court actually has before it any issue as to production in "paying quantities" from the Inman Pit. It seems to be immaterial whether there was such production at the end of the primary term of the lease in January 1957 because, as indicated, it is undisputed that Mr. Inman accepted royalties after the expiration of the primary term and thus recognized the continued life of the lease.

Plaintiffs contend that production in paying quantities ceased about 1961 and that paying quantity production has never been resumed; that is one of the bases on which plaintiffs contend that they are entitled to cancellation. The defendant says that if the extended term provisions of the lease are properly construed, it makes no difference whether there was production in paying quantities after the

end of the primary term, and that the Court should not have to explore the question of "paying quantity" production. However, the defendant, alternatively, at least seems to contend that the production achieved in the years following 1959 and set forth in the foregoing tabulation amounted to paying quantity production.

While the ultimate view which the Court takes of the case renders it actually unnecessary for the Court to pass upon the question, nevertheless in view of the positions of the parties the Court thinks it advisable to make findings on this phase of the case.

Solid mineral leases closely resemble oil and gas leases, 36 Am.Jur., Mines & Minerals, § 39, and oil and gas leases commonly provide that they shall remain in force for a stated primary term and for so long thereafter as oil or gas is produced in "paying quantities" or in "commercial quantities." A definition of "paying quantities" which would be valid for an oil and gas lease would seem equally valid for a soapstone lease.

An oil and gas lease is producing in "paying quantities" if it is yielding an operating profit or would yield such a profit to an operator of ordinary prudence, diligence, and skill, and this is so even if the profit is small and even though the cost of drilling or development is never repaid and even though the operations as a whole may result in an ultimate loss. 24 Am.Jur., Gas & Oil, § 70; Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774; see also Reynolds v. Smith, 231 Ark. 566, 331 S.W.2d 112, and Reynolds v. McNeil, 218 Ark. 453, 236 S.W.2d 723.

At the trial plaintiffs introduced no testimony bearing on the paying quantities phase of the case, apparently assuming that the tonnage and royalty figures in evidence spoke for themselves. The defendant called as a witness Mr. Hess, the manager of defendant's Bryant plant. Mr. Hess is a geologist rather than an accountant and most of his financial information came from Milwhite's

home office in Houston. He testified in substance that after paying the contractors for the ore and after paying royalties to landowners such as Inman, and after paying other costs, Milwhite derives a small profit from each ton of soapstone ore which it processes and sells.

Based on the testimony of Mr. Hess, defendant seems to contend that the Inman lease has always produced in paying quantities and is so producing now because Milwhite is making a profit on the Inman ore which it receives and processes.

■ The Court thinks that defendant's approach is wrong. The Court does not consider that the question of whether and during what periods the lease was producing in paying quantities is to be resolved by reference to whether Milwhite makes a profit on the ore which it obtains from the contractors and then processes and sells. As has been said, Milwhite, although it owns the lease, does not "operate" it, and the real operators are the contractors who dig and haul the ore.

In view of the tonnages hauled from the beginning of 1955 through 1959 the Court finds, as a matter of reasonable inference, that during that period, which includes the end of the primary term of the lease, ore from the Inman property was being produced in paying quantities. It appears to the Court that if the contractors were not making some profit from their operations during those years, they would not have continued to extract and haul the ore. As a matter of fact, it is not clear to the Court that plaintiffs seriously contend that the lease was not producing in paying quantities at the end of the primary term and down through 1959.

■ On the other hand, the Court agrees with plaintiffs that annual utilizations of about 1200 tons of Inman ore from 1961 down to the filing of the suit did not amount to production or utilization in paying quantities. More specifically, the Court finds that an operator of

ordinary prudence and skill could not have made and would not reasonably have expected to make a profit by hauling approximately 1200 tons of ore a year from the Inman properties and selling it to Milwhite for $2.35 per ton.

It is true that during the period just mentioned ore has been hauled from the stockpile and sold, and that the amounts have in general approximated 1200 tons a year. But, the contractors have also been hauling from other pits on other properties leased to Milwhite and not far from the Inman properties, and Milwhite has probably insisted that some ore be hauled from the Inman stockpile.

Presumably, the contractors are making a profit on their overall operations, and they may be making a profit on hauling the Inman ore. However, the Court does not think that a reasonably prudent operator would have hauled no more than 1200 tons of ore per year from the stockpile in recent years unless he had other sources of ore close at hand. And, the Court does not think that from a legal standpoint production in paying quantities from a given lease is to be determined by reference to an operator who has available to him not only ore from that lease but also ore from neighboring leases.

## II. *Construction of the Extended Term Provisions of the Lease.*

As indicated, plaintiffs contend, as the Court has found, that for several years prior to the filing of the suit the Inman lease had not been producing in paying quantities and that they are entitled to cancellation of the lease for that reason Defendant contends, on the other hand, that in view of the extended term provisions of the lease it remains in force and effect regardless of actual production so long as defendant pays or tenders in advance the minimum royalties and pays tonnage royalties on production in excess of 1200 tons in any given year. That controversy requires the Court to construe the relevant provisions of the lease, which have been quoted heretofore.

In construing the lease the Court recognizes that an ambiguous provision in a written contract must be construed most strongly against the party who or which prepared the instrument, in this case, Milwhite. However, written contracts must be construed as a whole, and an apparent ambiguity appearing in one section or paragraph of an instrument may be clarified or eliminated when that section or paragraph is read in connection with another portion or with other portions of the instrument.

Assuming arguendo that there is some ambiguity in Paragraph 2, standing alone, the Court is persuaded that the ambiguity is removed when Paragraphs 2 and 10 are read together. And the Court is convinced that when so read the meaning of the lease is that the extended term remains in force for so long as defendant pays or tenders the minimum royalties in advance and for so long as it pays the tonnage royalty on actual production in excess of 1200 tons per year, regardless of whether the actual production amounts to production in paying quantities. To put it more strongly, the Court finds that the lease can be held by paying the minimum advance royalty in lieu of any production or utilization of Inman ore.

## III. *The Validity of the Lease as Construed.*

Plaintiffs contend that the lease, as construed by the Court, is void for lack of mutuality of obligation. In this connection plaintiffs say that such lack of mutuality exists because defendant is not required affirmatively to extract or utilize any particular quantity of ore, or any ore at all for that matter, and because under Paragraph 7 of the lease defendant has a unilateral right to cancel the lease at any time whereas plaintiffs have no such right.

The most recent Arkansas cases dealing with mutuality of obligation are Andrews v. Victor Metals Corporation, 239 Ark. 763, 394 S.W.2d 123, and Lindner v. Mid-Continent Petroleum Co., 221

Ark. 241, 252 S.W.2d 631. The earlier Arkansas case of Mooney v. Gantt, 219 Ark. 485, 243 S.W.2d 9, involved a sand and gravel lease in which there was no express undertaking to remove material from the property. The still earlier case of Johnson v. Johnson, 188 Ark. 992, 68 S.W.2d 465, bears no particular resemblance to the instant case factually but is, nevertheless, instructive.

█ Those cases establish that under Arkansas law if a contract is supported by consideration, "mutuality of obligation," in the sense that plaintiffs use the term, is not required. The *Lindner* case is of particular interest here not only because of the opinion's· discussion of the doctrine of mutuality of obligation as now understood in Arkansas, but also because of the fact that in that case the Court rejected a contention that a filling station lease was void for lack of mutuality in view of the fact that the lessee had a unilateral right to cancel the lease upon short notice.

When the lease involved here is considered in the light of the Arkansas cases just cited, the Court is convinced that the lack of mutuality argument is without merit.

There is no evidence that this lease was procured from Mr. Inman by fraud or overreaching, and it is supported by adequate consideration. Apart from the formal recital of receipt of $10.00 and other good and valuable consideration, cf. Mooney v. Gantt, supra, the lease required Milwhite to pay at least one year's minimum royalty in advance; it has in fact paid royalties for many years. The stipulated minimum royalty is not a large sum of money, judged by present standards, but it is not nominal. Although, under the Court's construction of the lease, Milwhite is not required to dig or utilize Inman ore, it must pay the advance royalty and it must also pay tonnage royalty on production in excess of 1200 tons a year or lose the lease. Should Milwhite cancel the lease under Paragraph 7, it would not be entitled to a refund of the minimum royalty paid in advance at the beginning of the year of the termination.

█ There has been some suggestion in the case that the lease as construed by the Court would violate the rule against perpetuities. The same argument was made and rejected in McMillan v. Malvern Sand & Gravel Co., W.D.Ark., 136 F.Supp. 567, and the Court rejects it here.

### IV. *Breach of an Alleged Implied Covenant to Develop.*

The Court's construction of the lease and its findings with regard thereto are in effect dispositive of plaintiffs' contention that Milwhite has breached an implied covenant to develop the lease with reasonable diligence.

█ It is well settled in Arkansas that where the actual, moving consideration for a mining lease or for an oil and gas lease is the expectation of royalties on minerals to be extracted from the leased premises, and where the lease is silent as to development and operation, the lessee is held to be bound by implied covenant to develop and operate the premises with reasonable diligence; a failure on the part of the lessee to do so is ground for forfeiture of the lease. Mooney v. Gantt, supra; Smith v. Moody, 192 Ark. 704, 94 S.W.2d 357; Ezzell v. Oil Associates, Inc., 180 Ark. 802, 22 S.W.2d 1015; Mauney v. Millar, 134 Ark. 15, 203 S.W. 10; Mansfield Gas Co. v. Alexander, 97 Ark. 167, 133 S.W. 837.

█ Where, as here, however, the contracting parties have dealt specifically with the question of development and operation, their agreement governs, and "there can be no reason for implication." Mansfield Gas Co. v. Alexander, supra, 97 Ark. at 174, 133 S.W. at 840. See also: Bodcaw Oil Co., Inc. v. Atlantic Refining Co., 217 Ark. 50, 228 S.W.2d 626; Ezzell v. Oil Associates, Inc., supra; Grooms v. Minton, 158 Ark. 448, 250 S.W. 543; Dormon Farms Co. v. Stewart, 157

Ark. 194, 247 S.W. 778; Lawrence v. Mahoney, 145 Ark. 310, 225 S.W. 340.

Apart from the foregoing, the Court does not find that post-1959 decline in the utilization of Inman ore has been due to any bad faith or lack of diligence on the part of Milwhite or to any disposition on the part of Milwhite's personnel to discriminate against Mr. Inman in favor of other landowners. The truth of the matter is that for reasons fully disclosed in the evidence the quality of the Inman ore is such that it has not been marketable in large quantities for the past several years, due in large measure to Milwhite's loss of insecticide customers. It appears to the Court that Milwhite can use about 1200 tons of Inman ore a year, and it has been taking about that much. It should be borne in mind in this connection that the Milwhite mill at Bryant seems to be the only market for soapstone in the area. Milwhite can hardly be expected to take ore which it cannot market, and if Milwhite cannot use more Inman ore than it is taking, there is simply no prospective buyer for the additional ore available.

In the course of the trial Mr. Hess testified that in his opinion market conditions are changing for the better, and that within the very near future, perhaps before the end of the current year Milwhite will be taking substantially more ore from the Inman lease than it has taken during the post-1959 period down to this time. Although in view of the pendency of this litigation the Court attaches no legal significance to tonnage figures for 1966 and 1967, the Court will note in passing that the tabulation appearing in plaintiffs' brief reflects that in 1966 1,339.07 tons of ore were taken from the lease, a substantial increase over 1965, and that during the first six months of this year 1,068.16 tons had been removed; the tonnage last mentioned is approximately equal to that removed during all of 1965 and approaches the tonnage removed during the entire year 1966.

## V. Other Alleged Breaches of the Lease and Alleged Misuse of the Inman Property

In the complaint and in the course of the trial plaintiffs alleged and contended that apart from any question of diligence in production or of the meaning of the extended term provisions of the lease Milwhite has breached the lease in a number of ways and has misused the Inman property. Specifically, complaint is made that tonnages have been calculated on the basis of truck weights, whereas the lease calls for railroad weights, that ore has been stockpiled on the premises, and that the Inman lands have been used as a base of operations on other properties covered by Milwhite leases.

Those contentions have not been discussed in plaintiffs' brief which may indicate that counsel place little reliance upon them. The Court finds that those contentions are without merit and that they require no detailed discussion.

After the Milwhite mill was built at Bryant, it was obviously impractical to use railroad weights in calculating tonnage; tonnage has been calculated on the basis of average truck weights since at least 1955 as plaintiffs have well known. That method is as fair to plaintiffs as it is to Milwhite; there is no evidence that Milwhite has ever undertaken to cheat plaintiffs in any way. The Court does not think that the switch from railroad weights to truck weights constituted, in the circumstances, any breach of the lease; if it did, the breach has long since been waived.

The history of the stockpile is that at the outset of operations quantities of ore were found which were not marketable at the time and which defendant would have been justified as treating as useless overburden and discarding. Mr. Hess, however, was of the opinion that a market for this ore might develop, and he decided to save and stockpile the ore. To a limited extent the ore has become

marketable and the tonnage royalties which Inman has received in recent years represent ore removed from the stockpile. The lease expressly gives to Milwhite the right to store ore on the premises; there is no evidence that any ore from any other leases has ever been stored or stockpiled on the Inman land. Milwhite has never been obligated to pay royalties on ore until it is removed from the premises. The Court does not consider that the complaint about the stockpile is substantial.

▇▇▇ During active operations on the Inman lease some use of the Inman land was made in connection with operations on other leases. It appears that a combined garage and storehouse was constructed on the Inman land, and that some materials designed for use on the other leases were stored at times in the structure just mentioned; at times vehicles used in hauling ore from other leases may have been fueled or serviced on the Inman property. After operations on the Inman lease ceased some use of the garage-storehouse in connection with operations on other leases continued; however, the Court rejects plaintiffs' contention that in recent years the structure has been used as a storehouse for explosives designed for use on other leases.

Assuming without deciding that the uses of the Inman property described in the preceding paragraph were technically breaches of the lease, the Court does not think that they were significant, or that they damaged Inman or his property or amounted to a nuisance. More than that, Inman has known at all times what has been going on on his property and never made any serious complaint about the uses to which his property was being put until the commencement of this lawsuit. Even if the assumed breaches of the lease have not been waived, the Court does not consider them to be of a character which would call for or justify a cancellation of the lease.

A decree dismissing the complaint with prejudice and at the cost of plaintiffs will be entered.