NATIONAL ROPES, INC.,
Plaintiff-Appellant,

v.

NATIONAL DIVING SERVICE, INC.,
et al., Defendants,

First National Bank in Little Rock,
Intervenor-Appellee-Appellant,

National Electric Coil,
Intervenor-Appellee.

No. 74–1258.

United States Court of Appeals,
Fifth Circuit.

May 16, 1975.

Donald F. Geffner, Richard F. Ralph, Miami, Fla., for plaintiff-appellant.

J. Kirk Wood, Clifford B. Wentworth, Miami, Fla., for 1st Natl. Bank in Little Rock.

John N. Moore, III, Key West, Fla., for Natl. Electric Coil.

George D. Gold, Miami, Fla., for Natl. Diving Service.

Before BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This appeal comes to us for a determination of the interests of competing parties in certain wire rope and electric lifting magnets which were sold by two of the parties on appeal to an enterprise known as National Diving Service, Inc. (NDS), not a party to this appeal. It was argued before us as a contest between a secured party who had an interest in the rope and magnets as collateral under an after-acquired property clause, and the two vendors who sold the respective items to NDS. The district court awarded the wire rope to the secured party, but found that the magnet vendor's claim to the magnets was superior to the interest of the secured party. For the reasons set forth more fully below, we reverse the judgment of the district court and the case is remanded.

## I. FACTS

The two vendors who now claim an interest in the goods sold by each to NDS are National Electric Coil ("Coil"), a division of McGraw-Edison Company, an Ohio corporation, and National Ropes, Inc. ("Ropes"), a New York corporation. During July and August 1972, Coil sold two sets of lifting magnets to NDS, and Ropes filled two orders for wire rope from NDS. The magnets and rope were to be used in an operation to salvage steel from a vessel sunk in the Caribbean. The salvage operation was being organized in Key West, Florida; hence the magnets and rope were shipped there and placed upon the vessel "Real Gold." NDS was incorporated in Arkansas, however, and maintained its principal place of business in Little Rock, Arkansas.

All sales to NDS by Coil and Ropes were on an open account basis. Neither vendor took a purchase money security interest in the goods sold. Both, however, made routine credit checks in Arkansas before extending credit to NDS. In the course of checking NDS' credit references both vendors made telephone calls to the First National Bank in Little Rock ("Bank"), the other party to this appeal. Both Ropes and Coil were informed by a Bank officer that NDS had outstanding loans from the Bank. Neither vendor was told by the Bank of any existing security agreements between NDS and the Bank. Nor did either vendor check the Arkansas public records to find out whether the Bank had filed notice of any security agreements.

There was at least one security agreement between the Bank and NDS at the time Ropes and Coil made their phone calls to the Bank, a "General Pledge Agreement" dated June 9, 1972. Contemporaneously with the signing of this agreement, a standard financing statement[1] was filed in Arkansas, noticing a security interest in certain equipment owned or thereafter acquired by NDS. An identical financing statement was filed in Florida on January 30, 1973, after the commencement of this litigation.

The litigation over possession of the equipment sold by Coil and Ropes began November 29, 1972, when Ropes filed a complaint in admiralty against NDS and the vessel "Real Gold," asserting a maritime lien over the reels of wire rope. Shortly thereafter the Bank filed a motion to intervene as a defendant, asserting a security interest in the wire rope. Subsequently, Coil also moved to intervene, asserting a right to possession of the magnets which were on board the "Real Gold." The Bank claimed that the magnets also fell under its security interest.

As for the wire rope sold by Ropes, the district court directed a verdict against Ropes on its maritime lien claim[2] and also concluded, "Its only position is that of an open account creditor which has no right to the possession of goods in which [Bank] has a superior security interest."

Coil claimed that its sale to NDS was made in reliance on written misrepresentations of solvency by the officers of NDS, giving rise to a right of reclamation under Fla.Stats.Ann. § 672.2–702(2).

1. Uniform Commercial Code Form 1.

2. Ropes has not appealed this directed verdict.

It also claimed to have made a demand for adequate assurance of performance under Fla.Stats.Ann. § 672.2–609, which assurance had not been given, thereby repudiating the sale under Fla.Stats.Ann. § 672.2–609(4). Coil asserted that it had elected to void the sale. Further, Coil showed that it had filed suit in the Florida state courts against NDS and the owner of the "Real Gold" for a writ of replevin.

The district court found that these provisions of the Uniform Commercial Code relied upon by Coil gave Coil "the right to repudiate or rescind the sale and reclaim the goods." It also concluded:

> The goods sold by [Coil] to [NDS] did not attach to the security interest given by [NDS] to [the Bank] because
>
> (a) that security interest covered equipment located only in Little Rock, Arkansas;
>
> (b) it was of a type which is not used normally in more than one jurisdiction;
>
> (c) [Bank] did not disclose to, and in fact willfully withheld from [Coil], the fact that it, the bank, had a security agreement covering after-acquired property, thereby breaching its obligation of good faith; and
>
> (d) the security interest held by [the Bank] had not been perfected in any of the states where the magnets and accessory equipment were stored at the time of attachment of the security interest.

Ropes has appealed the award of possession of the wire rope to the Bank, and the Bank has appealed the award of the lifting magnets to Coil.

## II. THE BANK'S SECURITY INTEREST

The concepts of attachment and perfection of security interests, and the documents which relate to those concepts, have often been confused and intertwined in the litigation of this case. The arguments of some of the parties and the district court's findings of fact indicate an assumption that the Bank's security interest, if it existed at all, arose by virtue of the financing statements filed in the Arkansas public records. The function of such financing statements, however, is not to create a security interest but to perfect an interest that has already attached. Fla.Stats.Ann. §§ 679.9–302, –303.

The only security agreement between the Bank and NDS admitted into evidence is a General Pledge Agreement. The financing statement executed the same day covered "All Equipment now owned by, or hereafter acquired, located at, and pertinent to the National Diving Service, Inc., 3006 S. University, Little Rock, Arkansas." The vendors, Ropes and Coil, have vigorously argued that this financing statement's description does not include goods shipped directly to Key West, Florida from their plants or warehouses, located variously in Ohio, New York or Louisiana, because those goods were never "located at, and pertinent to" the Arkansas place of business of NDS.[3] This argument would be relevant only if we were concerned with determining whether the Bank's security interest were perfected or unperfected. The more critical issue is whether the underlying General Pledge Agreement provides a basis for the attachment of a

---

**3.** The Bank counters this contention of the vendors with the argument that this description is sufficient under Fla.Stats.Ann. § 679.9–110, which provides that any description of personal property is sufficient, "whether or not it is specific if it reasonably identifies what is described." The Bank argues that the financing statement's description is sufficient to suggest a course of inquiry to other creditors. There is a fundamental problem with this argument here, however, because further inquiry by the vendors into the General Pledge Agreement itself would no doubt have led them to conclude, as we have, that it does not comprehend the equipment they were contemplating selling to NDS.

security interest to the magnets and rope upon their acquisition by NDS.[4]

Set forth in the margin are the portions of the General Pledge Agreement upon which the Bank bases its claim that the magnets and rope became collateral for the Bank's loans and advances to NDS as soon as they came into the possession of NDS' Key West operation.[5] The Bank relies particularly upon that part of paragraph two of the Agreement which states: "the said Bank shall also have a lien . . . upon all property of the undersigned of every name and nature whatsoever, delivered to the Bank for safekeeping or otherwise . . . ." The Bank invites us to interpret this phrase as comprehending a security interest in all property of NDS, including after-acquired goods, regardless of whether such property is in the Bank's possession or retained in the possession of NDS.

Unfortunately, the posture of this litigation is not ideal for construing the Agreement. One of the parties to it, the pledgor NDS, was not involved in the trial, and there was no testimony from any of its principals as to its intent in making the contract. The Bank has offered no evidence of a course of dealing or usage of trade which would establish under Fla.Stats.Ann. § 671.1–205(4) that the General Pledge Agreement means anything other than what it says on its face. We have only a conclusion in the testimony of one Bank officer that the General Pledge Agreement covers the goods involved here, and the fact that a financing statement which was executed simultaneously notices a security interest in "Equipment," [6] including after-acquired equipment. Although the execution of the financing statement is some indication that NDS intended to assign goods such as the rope and magnets as collateral, the financing statement itself is insufficient to make that assignment. Moreover, the Bank has not contended that the two documents should be read together. Rather, it asserts that under the notice filing system established by the Uniform Commercial Code, Fla.Stats.

4. Section 679.9–204(1), Fla.Stats.Ann., provides: "A security interest cannot attach until there is agreement (§ 671.1–201(3)) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching." We are concerned here about the first of the three requirements set forth in this statute, that there be an agreement that the security interest attach.

5. The first two paragraphs of the General Pledge Agreement provide:

KNOW ALL MEN BY THESE PRESENTS, That the undersigned, in consideration of financial accommodations given or to be given renewed to or at the request of the undersigned by The First National Bank in Little Rock, Little Rock, Arkansas, do hereby agree with the said Bank that whenever the undersigned shall become or be directly or indirectly or absolutely or contingently indebted or liable to the said Bank for money loaned to or for money paid to or for the use or account of the undersigned, or for any overdraft, or upon any endorsement, draft, bill of exchange, note, guaranty, letter of credit, or other obligation or in open account or in any other manner whatsoever, the said Bank shall then and thereafter have the following rights and powers in addition to those created by the circumstances under which such indebtedness or liability may arise, against the undersigned or its or their successors, heirs, executors, administrators or assigns, namely:

All property of every name and nature whatsoever, delivered, conveyed, transferred or assigned by the undersigned to the said Bank as security for any such indebtedness or liability of the undersigned to the said Bank, shall also be held by the said Bank as security for any other indebtedness or liability of the undersigned to the said Bank whether now or at anytime hereafter existing, and the said Bank shall also have a lien upon any balance in any deposit accounts of the undersigned with the said Bank from time to time existing, *and upon all property of the undersigned of every name and nature whatsoever, delivered to the said Bank for safekeeping or otherwise*, or coming into the possession of said Bank, or into the possession of any one for it, in any manner whatsoever as security for any indebtedness or liability of the undersigned to the said Bank whether now or at any time hereafter existing. (Emphasis added.)

6. There is no dispute that the wire rope and lifting magnets fell within the definition of "equipment" contained in Fla.Stats.Ann. § 679.9–109(2).

58

Ann. § 679.9–402, the financing statement is "only a simple notice which indicates merely that the secured party *may* have a security interest in the collateral described." (Emphasis in the Bank's brief, p. 24.)

■ Applying Arkansas state law principles regarding rules for the construction of contracts,[7] we must read the General Pledge Agreement as a whole, with the purpose of effectuating the intent of the parties. *See* United States v. R. D. Wilmans & Sons, Inc., 147 F.Supp. 232 (E.D.Ark.1956), aff'd, 251 F.2d 509 (8th Cir. 1958); United States v. Wooten, 121 F.Supp. 130 (W.D.Ark.1954). We do not find either the particular phrase relied on by the Bank or the language of the General Pledge Agreement as a whole amenable to the interpretation given it by the Bank.

The result sought by the Bank can be reached only by focusing narrowly upon the phrase, "all property of the undersigned of every name and nature whatsoever, delivered to the said Bank for safekeeping or otherwise," which appears in the latter part of paragraph two. In order to sustain the Bank's position, we would be required to find either that the words, "all property of the undersigned of every name and nature whatsoever," are not modified or qualified by the further description, "delivered to the Bank for safekeeping or otherwise," or that the words "or otherwise" were intended to relate back to "delivered to the Bank," rather than to "for safekeeping."

While there is some plausibility in the Bank's interpretation, it seems to circumvent the context in which the phrase appears. It is certainly just as plausible to find that the phrase was not intended to stand alone, but is limited by the words which follow, and that "or otherwise" refers to "for safekeeping" so that the purpose for which property is delivered to the Bank does not affect the Bank's interest in the property. Under

this construction, this phrase gives the Bank a security interest only in property delivered to it. Thus our examination of the particular language is inconclusive at best and we must examine other parts of the Agreement to see what light is shed upon the phrase that is critical to this litigation.

■ Significantly, the words "for safekeeping or otherwise" occur again in paragraph four, in a context which makes it difficult to accept the Bank's argument regarding "or otherwise." That paragraph provides that under certain conditions,

all indebtedness and liabilities . . shall at the option of the said Bank become and be immediately due and payable . . . , and the said Bank in such event may thereupon . . . sell any and all property of [NDS] of every name and nature whatsoever, delivered, conveyed, transferred or assigned to the said Bank as security for any indebtedness or liability of [NDS] to the said Bank, *or for safekeeping or otherwise*, or coming into the possession of the said Bank, or the possession of any one for it in any manner whatsoever . . . . (Emphasis added.)

In this context, it is apparent that "or otherwise" refers to and enlarges "for safekeeping" rather than "delivered to the Bank." It is logical to assume that the words were intended to convey the same meaning both times they were used. *See* Willingham v. Life & Casualty Insurance Co. of Tennessee, 216 F.2d 226, 227 (5th Cir. 1954).

Moreover, examining the Agreement as a whole in an effort to determine the intent of the parties, we find that it appears to have two basic purposes. First, it appears to be designed to supplement other credit arrangements between the Bank and NDS, including other security agreements which assign specific property as collateral. The preamble provides: "whenever [NDS] shall become or be . . . indebted to the

7. Under Florida choice of law rules, a contract is interpreted in accord with the law of the state where the contract was made, in this

case Arkansas. Center Chemical Co. v. Avril, Inc., 392 F.2d 289, 290 (5th Cir. 1968).

said Bank for money loaned . . . , the said Bank shall then and thereafter have the following rights and powers *in addition to those created by the circumstances under which such indebtedness or liability may arise against [NDS] . . . .*" (Emphasis added.) The Agreement then goes on to set forth the rights and powers of the Bank over collateral which consists of shares of stock (paragraphs five and six), or life insurance (paragraph eight).

The second principal purpose of the Agreement seems to be to create a security interest in the Bank in all NDS property which is directly or indirectly in the Bank's possession or control. In paragraph two this is stated as a lien, while paragraph three provides, "any moneys or other property at any time in the possession of said Bank belonging to [NDS] . . . may at all times at the option of said Bank be held and treated as collateral security . . . ." These provisions, particularly paragraph three which clearly applies only to property or assets in the Bank's possession, are superfluous if paragraph two operates to convey a security interest in all of the assets then owned and thereafter acquired by NDS, as the Bank argues.

Paragraph four also contains language which is unnecessary surplusage if we accept the Bank's interpretation of the Agreement. There, NDS agrees "at any time and from time to time upon demand of the said Bank to deliver, convey, transfer or assign to the said Bank as security for any and all indebtedness and liabilities of [NDS] to the said Bank, collateral security of a value and character satisfactory to the said Bank . . . ."

█ The Agreement provides in a very detailed and meticulous manner that NDS property in the Bank's possession shall be loan collateral. The drafters of the Agreement attempted to leave no stone unturned in the description of the possessory nexus which forms the basis of the Bank's security interest. Thus in the immediate context of the phrase which the Bank relies upon, the Agreement speaks of property "delivered to the said Bank for safekeeping or otherwise, or coming into the possession of said bank, or into the possession of any one for it, in any manner whatsover . . . ." Elsewhere, the Agreement spells out that moneys and other property in the Bank's possession, deposits, balance of deposits or other sums credited or due NDS from the Bank may be held as loan collateral. It is inconsistent with this attempted comprehensiveness to assume that the parties would create in a few vague words a security interest in the potentially vast range of property and goods which composes the assets of NDS. For example, it would be an ordinary business caution to specify at least that the security agreement covered both real and personal property, equipment and inventory, wherever located and whether owned by NDS at the time of making the agreement or later acquired.

The language relied upon by the Bank to establish its secured position relative to the magnets and rope simply cannot be read to have the sweeping effect claimed by the Bank. The creation of a security interest in each and every present and future asset of a debtor is by no means an insignificant commercial transaction. Common sense suggests that parties to such an agreement would not make known their intent with a single obscure and ambiguous phrase buried in a much longer document. In the final analysis, the ambiguity in the General Pledge Agreement must be the Bank's undoing, since it was the party which drafted the Agreement. A document must be construed most strongly against the party which drafted it. *Inman v. Milwhite Co.*, 292 F.Supp. 789, 794 (E.D. Ark.1967); *United States v. R. D. Wilmans & Sons, Inc.*, supra, 147 F.Supp. at 239. The ambiguity therefore cannot be resolved in the Bank's favor. The Bank failed to establish that the documents executed by NDS gave it a security interest in either the wire ropes or the lifting magnets involved here.

█ Therefore, that portion of the district court's judgment awarding the wire

rope to the Bank must be reversed. It does not necessarily follow, however, that National Ropes is entitled to possession based on the facts established by this record. Ropes has not appealed the directed verdict against it on its maritime lien claim. The district court correctly found that Ropes' status is that of an open account creditor. Ropes has weakly asserted on appeal that it has a right to possession by virtue of a vendor's lien, arising solely because it sold and delivered goods to a purchaser who did not pay for them. This is not sufficient to create a purchase money security interest under Fla.Stats.Ann. § 679.9–107. Nor has Ropes made any argument that any provisions of Article 2 of the Uniform Commercial Code entitle it to repossess the reels of wire rope. On remand, of course, Ropes may establish that there is a set of facts and a legal theory that entitle it to the right of possession.

### III. COIL'S RIGHT TO RECLAMATION

Although Coil, as an open account creditor, was in that fundamental respect situated identically to Ropes, the district court awarded possession of the lifting magnets to Coil, finding Coil's right to reclaim the magnets to have arisen under Fla.Stats.Ann. § 672.2–702(2), dealing with the buyer's insolvency,[8] and Fla.Stats.Ann. § 672.2–609(4), dealing with the right to adequate assurance of performance.[9]

■ The record does not support the application of these two Uniform Commercial Code provisions to Coil's sale of

the magnets. Critical to a right to reclaim under Fla.Stats.Ann. § 672.2–702(2) is the buyer's receipt of goods while insolvent. Coil produced no evidence that NDS was insolvent when it received either shipment of the magnets. Furthermore, the seller's demand for reclamation must, under the terms of § 672.2–702(2), be made within ten days of the buyer's receipt of the goods. Coil did not assert its right to reclaim within the applicable ten day limitation.

■■ Nor may Coil claim the benefit of a written misrepresentation of solvency within three months before delivery of the goods, which would have the effect of dissolving the ten-day limitation for reclamation of the second shipment of magnets.

Between the first and second shipment of magnets, NDS provided Coil with a financial statement pursuant to a telephone request. A Coil officer testified to a later conversation in which an officer of NDS purportedly admitted that the financial statement "was not the true financial picture" of NDS. This hearsay testimony was the only evidence as to the accuracy or inaccuracy of the financial statement. Even accepting that it sufficiently establishes that there was a written misrepresentation, it does not show that NDS was insolvent at the time the misrepresentation was made; hence it cannot be accepted as a written "misrepresentation of solvency" within the meaning of Fla.Stats.Ann. § 672.2–702(2).

■ The district court's factual basis for applying Fla.Stats.Ann. § 672.2–609(4) is not clear. The district court

---

8. Section 672.2–702(2), Fla.Stats.Ann. provides:

Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

9. Section 672.2–609, Fla.Stats.Ann., provides:

(1) . . . when reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance . . . (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

made no finding that Coil had "reasonable grounds for insecurity" with respect to NDS' performance, Fla.Stats.Ann. § 672.2–609(1), which would have justified a demand for adequate assurance of due performance; nor would the record support such a finding at the time the demand for assurance was supposedly made.

The statute also requires such a demand to be in writing. The letter upon which Coil relies for this purpose is not a demand for adequate assurance, but rather a request that NDS accelerate payment for the first shipment, even though payment was not yet due. There is therefore no factual basis for holding that NDS repudiated the contract by operation of Fla.Stats.Ann. § 672.2–609(4).

The judgment of the district court is reversed and the case is remanded for proceedings not inconsistent with this opinion.